IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

No. 23-10343

CLARISSA GILMORE

Plaintiff-Appellant,

vs.

GEORGIA DEPARTMENT OF CORRECTIONS, et al.

Defendants-Appellees.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA, STATESBORO DIVISION

---

**BRIEF OF PLAINTIFF-APPELLANT**

---

Janai S. Nelson
President & Director-Counsel
Ashok Chandran*
Arielle Humphries
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
T: (212) 965-2200
F: (212) 226-7529

Christopher Kemmitt
NAACP LEGALDEFENSE AND
EDUCATIONAL FUND, INC.
700 14th Street NW, Ste. 600
Washington, DC 20005
T: (202) 682-1300
F: (202) 682-1312

Shania King
The Law Office of Shania King, LLC
1075 Peachtree St.
Atlanta, GA 30039

*Counsel for Plaintiff- Appellant*
*Counsel of Record*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, the NAACP Legal Defense and Educational Fund, Inc., and The Law Office of Shania King, LLC, state that they have no parent corporations, nor have they issued shares or debt securities to the public. These organizations are not subsidiaries of or affiliated with any publicly owned corporation, and no publicly held corporation holds ten percent of their stock.  Counsel hereby certifies that the following is a complete list of interested persons:

1. Baker, R. Stan, *District Court Judge*

2. Boyer, Matthew, *Attorney for Defendants/Appellees*

3. Carr, Christopher M., *Attorney for Defendants/Appellees*

4. Chalmers, Roger A., *Attorney for Defendants/Appellees*

5. Chandran, Ashok, *Appellate Attorney for Plaintiff/Appellant*

6. Cusimano, Angela Ellen, *Attorney for Defendants/Appellees*

7. Georgia Department of Corrections, *Defendant*

8. Gilmore, Clarissa, *Plaintiff/Appellant*

9. Humphries, Arielle, *Appellate Attorney for Plaintiff/Appellant*

10. Irizarry, Christina M., *Defendant*

11. Kemmitt, Christopher, *Appellate Attorney for Plaintiff/Appellant*

12. King, Shania, *Attorney for Plaintiff/Appellant*

13. Lupo, Sabrini Carlene, *Defendant*

ii

14.   Milton, Alberta W., *Defendant*

15.   NAACP Legal Defense and Educational Fund, Inc., *Appellate Attorneys for Plaintiff/Appellant*

16.   Nelson, Janai S., *Appellate Attorney for Plaintiff/Appellant*

17.   Pinkston-Pope, Loretta L., *Attorney for Defendants/Appellees*

18.   Ray, Christopher L., *Magistrate Judge*

19.   Roney, Alexia, *Attorney for Defendants/Appellees*

20.   Smith, Tarmarshe A., *Defendant*

21.   Spital, Samuel, *Appellate Attorney for Plaintiff/Appellant*

22.   The Law Office of Shania King, *Attorneys for Plaintiff/Appellant*

23.   Ward, Timothy C., *Georgia Department of Corrections Commissioner*

24.   Sheets, Mulik, *Witness*

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff-Appellant respectfully requests that the Court hear oral argument in this case. The case implicates important questions regarding the protection of federal constitutional rights that have potentially broad implications for the operation of prison facilities throughout the Circuit. Those questions warrant oral argument to ensure their full and fair resolution.

# TABLE OF CONTENTS

Certificate of Interested Persons and Corporate Disclosure
Statement ................................................................................................... ii

Statement Regarding Oral Argument ..................................................... iv

Table of Authorities ............................................................................... vii

Introduction ............................................................................................... 1

Statement of Jurisdiction ......................................................................... 3

Statement of Issues Presented ................................................................. 4

Statement of the Case ............................................................................... 5

     I.    Factual Background ............................................................... 5

          A.    Ms. Gilmore Clears All Standard Security Procedures to Visit Her Then-Husband at Smith State Prison on February 26, 2017. .................................................................... 5

          B.    Defendants Decide to Strip Search Ms. Gilmore Without Suspicion After Lieutenant Milton Stares Down Ms. Gilmore and Feels Disrespected When Ms. Gilmore Stares Back at Her . ................................................................... 7

          C.    Defendants Strip Search Ms. Gilmore. ..................................... 9

     II.    Procedural History ............................................................ 12

Summary of the Argument ..................................................................... 16

Standard of Review ................................................................................. 18

Argument ................................................................................................. 18

     I.    Defendants Violated Ms. Gilmore's Fourth Amendment Rights When They Strip-Searched Her Without Reasonable Suspicion and Used Unreasonably Intrusive Measures .................................................... 19

A.  Because There Was No Evidence Ms. Gilmore Had Drugs Inside Her Clothing, the Search Was Not Justified at Its Inception. ...............................................................................20

B.  Defendants Conducted the Search in an Abusive Manner That Was Not Reasonably Related to the Circumstances. ...............25

II.  Defendants Are Not entitled to Qualified Immunity For Strip Searching Ms. Gilmore ...................................................................27

A.  The District Court Plainly Erred in Finding Defendants Acted Within the Scope of Their Discretionary Authority Because They Violated Express Restrictions on Their Authority. .........29

B.  It Has Long Been Clearly Established that Strip Searches Require Reasonable Suspicion and Cannot Be Excessively Intrusive. ...............................................................................34

1.  Supreme Court and circuit authority clearly establish the need for at least reasonable suspicion before a prison visitor may be strip-searched. ........................................................................36

2.  The only exception to the requirement of reasonable suspicion is for incarcerated persons immediately following contact with the free world, who may be visually strip searched pursuant to a nondiscretionary policy. ..........................................................37

3.  It is clearly established that invasive physical contact during a strip search is excessive in scope. ...........................................42

4.  The District Court ignored Florence's own admonitions, turning it into an exception that swallows the rule. ................................44

C.  Defendants Were on Fair Notice of Their Unconstitutional Conduct Because of Both Case Law and Their Own Regulations—Which They Admitted in Briefing to the District Court. ......................................................................................47

Conclusion ...............................................................................................50

Certificate of Compliance ........................................................................52

Certificate of Service ...............................................................................52

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adrienne Roggenbuck Tr. v. Dev. Res. Grp., LLC*,
  505 F. App'x 857 (11th Cir. 2013)...................................................30

*Al-Amin v. Smith*,
  511 F.3d 1317 (11th Cir. 2008)......................................................47

*Alcocer v. Mills*,
  906 F.3d 944 (11th Cir. 2018).........................................................18

*Bd of Educ. of Indep. Sch. Dist. No. 92 v. Earls*,
  536 U.S. 822 (2002).......................................................................41

*Bell v. Wolfish*,
  441 U.S. 520 (1979)..................................................................*passim*

*Blue Martini Kendall, LLC v. Miami Dade Cnty., Fla.*,
  816 F.3d 1343 (11th Cir. 2016)......................................................29

*Brent v. Ashley*,
  247 F.3d 1294 (11th Cir. 2001)...........................................20, 22, 35

*T.R. ex rel. Brock v. Lamar Cnty. Bd. of Educ.*,
  25 F.4th 877 (11th Cir. 2022)....................................................*passim*

*Burch v. P.J. Cheese, Inc.*,
  861 F.3d 1338 (11th Cir. 2017)......................................................29

*Burton v. Tampa Hous. Auth.*,
  271 F.3d 1274 (11th Cir. 2001)......................................................18

*Butterworth v. Bowen*,
  796 F.2d 1379 (11th Cir. 1986)......................................................32

*Calloway v. Lockey*,
  948 F.3d 194 (4th Cir. 2020)..........................................................39

*Cantu v. City of Dotham*,
   974 F.3d 1217 (11th Cir. 2020) ......................................................... 34

*Cates v. Stroud*,
   976 F.3d 972 (9th Cir. 2020) ..................................................... 26, 39

*Cochrane v. Quattrocchi*,
   949 F.2d 11 (1st Cir. 1991) ............................................................. 23

*Daugherty v. Campbell*,
   33 F.3d 554 (6th Cir. 1994) ....................................................... 21, 35

*D.H. ex rel. Dawson v. Clayton Cnty. Sch. Dist.*,
   830 F.3d 1306 (11th Cir. 2016) ................................................ 25, 34

*Delaware v. Prouse*,
   440 U.S. 648 (1979) ........................................................................ 40

*Dist. of Columbia v. Wesby*,
   138 S. Ct. 577 (2018) ...................................................................... 27

*Est. of Cummings v. Davenport*,
   906 F.3d 934 (11th Cir. 2018) ......................................................... 30

*Evans v. City of Zebulon*,
   351 F.3d 485 (11th Cir. 2003) ......................................................... 42

*Evans v. Stephens*,
   407 F.3d 1272 (11th Cir. 2005) ................................................. *passim*

*Florence v. Board of Chosen Freeholders of County of Burlington*,
   566 U.S. 318 (2012) ................................................................ *passim*

*Florida v. Bostick*,
   501 U.S. 429 (1991) ........................................................................ 32

*Fonder v. Sheriff of Kankakee Cnty.*,
   823 F.3d 1144 (7th Cir. 2016) ......................................................... 38

*Fugate v. Erdos*,
   No. 21-4025, 2022 WL 3536295 (6th Cir. Aug. 18, 2022) .............. 38

*Glasscox v. City of Argo*,
    903 F.3d 1207 (11th Cir, 2018)..........................................................33

*Harbert Int'l, Inc. v. James*,
    157 F.3d 1271 (11th Cir. 1998)..........................................................30

*Harris v. Ostrout*,
    65 F.3d 912 (11th Cir. 1995)..............................................................23

*Hinkle v. Beckham Cnty. Bd. of Cnty. Comm'rs*,
    962 F.3d 1204 (10th Cir. 2020)..........................................................38

*Holloman ex rel. Holloman v. Harland*,
    370 F.3d 1252 (11th Cir. 2004)....................................................27, 28

*Hope v. Pelzer*,
    536 U.S. 730 (2002)...........................................................................47

*Hudson v. Palmer*,
    468 U.S. 517 (1984)...........................................................................23

*Hunter v. Auger*,
    672 F.2d 668 (8th Cir. 1982)........................................................21, 35

*Lenz v. Winburn*,
    51 F.3d 1540 (11th Cir. 1995)............................................................30

*May v. City of Nahunta*,
    846 F.3d 1320 (11th Cir. 2017)....................................................19, 42

*Mays v. Springborn*,
    719 F.3d 631 (7th Cir. 2013)..............................................................24

*Mich. Dep't of State Police v. Sitz*,
    496 U.S. 444 (1990)...........................................................................40

*New Jersey v. T.L.O.*,
    469 U.S. 325 (1985)..............................................................35, 40, 41

*Parkell v. Danberg*,
    833 F.3d 313 (3d Cir. 2016)...............................................................38

*Parker v. Scrap Metal Processors, Inc.*,
    386 F.3d 993 (11th Cir. 2004)............................................................29

*Powell v. Barrett*,
    541 F.3d 1298 (11th Cir. 2008).................................................*passim*

*Powell v. Snook*,
    25 F.4th 912 (11th Cir. 2022).........................................................34

*Romo v. Champion*,
    46 F.3d 1013 (10th Cir. 1995), *cert denied*, 516 U.S. 947 (1995)..............21, 36

*Safford United Sch. Dist. No. 1 v. Redding*,
    557 U.S. 364 (2009).............................................................18, 35, 47

*Sconiers v. Lockhart*,
    946 F.3d 1256 (11th Cir. 2020).......................................................18

*Taylor v. Riojas*,
    141 S. Ct. 52 (2020)....................................................................47

*Thorne v. Jones*,
    765 F.2d 1270 (5th Cir. 1985).......................................................21, 35

*Tolan v. Cotton*,
    572 U.S. 650 (2014)..........................................................18, 27, 33, 49

*United States v. Fowlkes*,
    804 F.3d 954 (9th Cir. 2015)..........................................................43

*United States v. Touset*,
    890 F.3d 1227 (11th Cir. 2018).....................................................25, 43

*Varone v. Bilotti*,
    123 F.3d 75 (2d Cir. 1997)..........................................................21, 35

*Veronia Sch. Dist. 47J v. Acton*,
    515 U.S. 646 (1995)....................................................................40

*Williams v. City of Cleveland*,
    771 F.3d 945 (6th Cir. 2014)..........................................................43

*Winston v. Lee*,
    470 U.S. 753 (1985)..................................................................................25, 48

*Wood v. Clemons*,
    89 F.3d 922 (1st Cir. 1996) ......................................................................21, 35

**Statutes**

28 U.S.C. § 1291....................................................................................................4

28 U.S.C. § 1331....................................................................................................3

42 U.S.C. § 1983....................................................................................................3

**Other Authorities**

11th Cir. L.R. 3-1................................................................................................29

**<u>INTRODUCTION</u>**

Plaintiff Clarissa Gilmore was strip-searched on February 26, 2017, about thirty minutes into a visit with her then-husband at Smith State Prison in Georgia. Defendants Alberta Milton and Christina Irizarry began the search by ordering Ms. Gilmore to remove all her clothing, including her underwear. Lieutenant Milton directed Officer Irizarry to grab and manipulate Ms. Gilmore's breasts and then ordered Ms. Gilmore to bend over and spread her buttocks. While Ms. Gilmore was bending over, Lieutenant Milton ordered Officer Irizarry to insert her gloved hand between Ms. Gilmore's buttocks and feel around. Lieutenant Milton and Officer Irizarry then directed Ms. Gilmore to spread her vagina for them to observe. The experience left Ms. Gilmore humiliated and traumatized; after leaving the prison, she broke down crying.

The record, taken in the light most favorable to Ms. Gilmore, establishes that Lieutenant Milton and Officer Irizarry had no basis to believe that Ms. Gilmore was carrying contraband of any kind when they decided to subject her to this extreme and invasive search. Before Ms. Gilmore encountered Lieutenant Milton and Officer Irizarry, several other correctional officers had subjected her to rigorous entry screenings, and Ms. Gilmore did not behave at all suspiciously during the thirty minutes she sat with her then-husband under Lieutenant Milton's watch. Indeed, Lieutenant Milton's boss, Defendant Tamarshe Smith, later

1

watched video footage from the visitation room and told Ms. Gilmore that she had done nothing that would justify a strip search.

Ms. Gilmore sued for the violation of her Fourth Amendment rights. The District Court granted Defendants qualified immunity for their conduct, holding that extant law did not clearly establish that highly invasive strip searches require *any* level of suspicion for prison visitors. In reaching that conclusion, the District Court determined that decades of precedent requiring at least reasonable suspicion before any strip search of a civilian was no longer clearly established based on the Supreme Court's decision in *Florence v. Board of Chosen Freeholders of County of Burlington*, 566 U.S. 318 (2012). But *Florence*, by its express terms, authorizes suspicionless searches in just one narrow situation: *blanket* policies involving suspicionless *visual* strip searches of *detainees joining the general population* of a jail following contact with the outside world. It thus has no bearing on Ms. Gilmore's claim. She was individually selected for an extreme and physically invasive strip search as a civilian lawfully visiting a facility whose own policy for conducting strip searches required reasonable, individualized suspicion.

The District Court therefore erred in granting Defendants qualified immunity because the strip search was unjustified at its inception and excessive in scope. It also erred by even considering qualified immunity as an available defense: because

Defendants acted outside the scope of their expressly defined authority under state law, they were categorically ineligible for qualified immunity.

If left undisturbed, the District Court's opinion would leave prison officials free to arbitrarily subject anyone inside a prison—a lawyer visiting a client, a faith leader ministering to incarcerated people, or a child visiting their parent—to humiliating and invasive strip searches, without facing any accountability for the clear constitutional violation. This Court should intervene, reverse the grant of summary judgment, and remand this case for trial.

## STATEMENT OF JURISDICTION

The District Court properly exercised jurisdiction over Plaintiff's federal claim pursuant to 28 U.S.C. § 1331, as that claim arises under 42 U.S.C. § 1983 and the Fourth Amendment to the United States Constitution. Plaintiff's other claims, which arose under various state laws, were dismissed in an opinion and order dated December 9, 2020, and are not at issue in this appeal. The District Court entered summary judgment for Defendants on Plaintiff's Fourth Amendment claim in an opinion and order dated January 18, 2023. In doing so, the District Court adopted in full a Magistrate Judge's report and recommendation dated May 10, 2022, to which all parties filed objections.

The District Court's grant of summary judgment on Plaintiff's Fourth Amendment claim, the only claim remaining in this case, constituted a final order

over which this Court has jurisdiction pursuant to 28 U.S.C. § 1291. Plaintiff timely filed a notice of appeal on January 31, 2023, properly invoking this Court's jurisdiction.

## STATEMENT OF ISSUES PRESENTED

1.      Did the District Court plainly err by finding that Defendants acted within the scope of their discretionary authority despite evidence that they violated three separate regulations limiting the procedures for strip searches by: (1) failing to seek and obtain necessary approval beforehand; (2) failing to obtain valid consent for the strip search; and (3) conducting the strip search in a highly invasive manner proscribed by the regulations?

2.      Did Defendants violate Ms. Gilmore's Fourth Amendment rights when they strip searched her without any reason and did so by physically manipulating her breasts, reaching inside her buttocks, and visually inspecting her genitals?

3.      Did the District Court err by holding that the Supreme Court's decision in *Florence v. Board of Chosen Freeholders of County of Burlington* unsettled decades of precedent across the federal circuits unanimously establishing that strip searches of civilians are only justified at their inception if officers possess at least a reasonable suspicion of discovering contraband?

4

4.      Did the District Court err by holding that a strip search of a civilian was not clearly excessive in scope despite the fact that a correctional officer physically lifted the civilian's breasts, inserted their hand between her buttocks and felt around, and then directed the civilian to spread her vagina for inspection?

## STATEMENT OF THE CASE

### I.    FACTUAL BACKGROUND

#### A.    Ms. Gilmore Clears All Standard Security Procedures to Visit Her Then-Husband at Smith State Prison on February 26, 2017.

On the morning of February 26, 2017, Clarissa Gilmore left her house before dawn to begin the long drive to Smith State Prison ("SSP"). Doc. 52-4 at 3[1]. Ms. Gilmore was no stranger to the trek. Her then-husband, Mulik Sheets, was incarcerated at SSP, and Ms. Gilmore drove to see him twice a month. *Id.* at 2. She had visited him at least 48 previous times at SSP and had seen him twice a month at other Georgia Department of Corrections ("GDC") facilities before he was transferred to SSP. *Id.*; Doc. 52-3 at 1. Prior to February 26, 2017, Ms. Gilmore had never been accused of trying to introduce contraband into a GDC facility, and she had never been accused of possessing drugs in any context. Doc. 52-3 at 2.

Ms. Gilmore arrived at SSP at 10:30 a.m., signed in for her visit, and proceeded through the gauntlet of prison security procedures. *Id.* Like all other

---

[1] Documents filed with the District Court are cited as "Doc. ___."

prison visitors, she had to stand in a "Through Body Scanner," which uses electromagnetic radiation to locate weapons or contraband "on or within [the] body cavities" of prison visitors. Doc. 50-10 at 3–5; *see also* Doc. 52-3 at 2; Doc. 52-4 at 20. She then submitted to a pat-down search by a correctional officer. Doc. 52-3 at 2; Doc. 52-4 at 20. And finally, a correctional officer used a metal detector wand to check her again for contraband. *See id*. In total, Ms. Gilmore encountered at least four officers that day before encountering Defendants. Doc. 52-4 at 84.

Ms. Gilmore cleared security before correctional officers escorted her to a second building, which contained the visitation room. Doc. 52-4 at 21. Correctional Officer Sabrini Lupo was seated at the front desk of the visitation room, Doc. 50-4 at 2; *see also* Doc. 52-4 at 27, 31, and Lieutenant Milton was the Officer-in-Charge that day. Doc. 50-5 at 2. As a frequent visitor to SSP, Ms. Gilmore was familiar with both Lieutenant Milton and Officer Lupo. Lieutenant Milton had been present for most of Ms. Gilmore's visits to SSP, and, in Ms. Gilmore's experience, Lieutenant Milton was consistently unpleasant, no matter how nice Ms. Gilmore was. Doc. 52-4 at 41. She was "a little snappy woman," who was "always going to make a comment" and would stare at Ms. Gilmore during her visits until she stared back at Lieutenant Milton. *Id.* at 41. Ms. Gilmore was also familiar with Officer Lupo because Officer Lupo usually sat at the front desk in the visitation room. Doc. 52-4 at 30–31. In Ms. Gilmore's experience,

6

Officer Lupo was "rude every time" she visited and had a "very, very, very nasty" demeanor. *Id.* at 32.

Ms. Gilmore proceeded to the front desk, and Officer Lupo assigned her to a visitation table. Doc. 50-4 at 2. Mr. Sheets joined her, and the two started their visit. Officer Lupo and Lieutenant Milton remained present in the visitation room with Ms. Gilmore and Mr. Sheets. Doc. 52-4 at 27.

### B. Defendants Decide to Strip Search Ms. Gilmore Without Suspicion After Lieutenant Milton Stares Down Ms. Gilmore and Feels Disrespected When Ms. Gilmore Stares Back at Her.

From here, the parties' accounts of events differ drastically. Ms. Gilmore testified that about half an hour into her visit with Mr. Sheets, she noticed that Lieutenant Milton was staring at her. Doc. 52-4 at 36. Lieutenant Milton proceeded to walk toward Ms. Gilmore, staring the entire way. *Id.* Ms. Gilmore stared back. *Id.* As Ms. Gilmore explained, "[b]y the time she got about two feet away from me, it was, like, dead-on stare, slow walking, looking at me, and I'm looking back at her." *Id.* at 37. In total, the two stared at each other for one to two minutes, which is the longest they ever stared at each other. *Id.* at 84–85. Lieutenant Milton appeared to feel disrespected by Ms. Gilmore staring back at her. *Id.* at 86; Doc. 52-3 at 2. Then "[Lieutenant Milton] walked right by [Ms. Gilmore], looked at [her] crazy," and walked over to the front desk where other officers were standing. Doc. 52-4 at 46. Lieutenant Milton left the room briefly to get Officer Irizarry, *id.*

at 50, re-entered, and directed Ms. Gilmore to come with her. *Id.* at 49; Doc. 52-3 at 2. At this point, Ms. Gilmore had not engaged in suspicious behavior of any kind and had given Lieutenant Milton no reason to search her. *See* Doc. 52-3 at 3.

Defendants, for their part, testified that Officer Lupo had smelled marijuana on Ms. Gilmore thirty minutes prior, although none of the officers involved in scanning, wanding, or patting down Ms. Gilmore upon her entry to the facility detected any such odor. Doc. 50-4 at 2. Despite GDC regulations directing that such suspicion should result in immediate termination of a visit, Doc. 50-9 at 18, Officer Lupo testified that she nonetheless allowed Ms. Gilmore to visit Mr. Sheets. Doc. 50-4 at 2. Ms. Gilmore denied consuming, possessing, or smelling like marijuana at any point during her visit. Doc. 52-3 at 3. Officer Lupo also testified that she observed Ms. Gilmore and Mr. Sheets for the next hour, and determined that they were focusing on her and not their visit, which she considered suspicious. Doc. 50-4 at 3. Again, Ms. Gilmore denied looking at Officer Lupo at all during her visit. Doc. 52-3 at 3.

Officer Lupo relayed her alleged observations to Lieutenant Milton, who was also present in the room but did not testify that she observed any such conduct. Doc. 50-4 at 2; Doc. 50-5 at 2. Still, Lieutenant Milton determined that Officer Lupo's report provided reasonable suspicion—the legal standard that the GDC regulations require for all strip searches of prison visitors, *see* Doc. 50-10 at 5; Doc

50-5 at 2—for the search. Doc 50-5 at 2. In her contemporaneous documentation of the incident, however, Lieutenant Milton made no reference to any odor of marijuana or suspicious eye contact. Instead, her sworn report simply stated that Ms. Gilmore "was going to introduce contraband into the institution." Doc. 50-8 at 8.

Aware that GDC regulations required the approval of a deputy warden before any strip search could be conducted, Lieutenant Milton testified that she then called Deputy Warden Tamarshe Smith, who approved the search. Doc. 50-5 at 3; *see also* Doc. 50-3 at 4. Her contemporaneously sworn statement, however, made no reference to any such call. Doc. 50-8 at 8. And duty records show that Deputy Warden Smith was not working on February 26, 2017. Doc. 52-14.

### C.    Defendants Strip Search Ms. Gilmore.

The parties do not dispute that Lieutenant Milton then ordered Ms. Gilmore out of the visitation room, where Officer Irizarry joined them. Doc. 52-4 at 50, 52; Doc. 50-5 at 3; Doc. 50-6 at 2. Lieutenant Milton and Officer Irizarry then presented Ms. Gilmore with a strip search consent form to sign. Doc. 50-5 at 3; Doc. 50-6 at 3. According to Ms. Gilmore, the form was entirely blank, and the lines provided for the signatures of the approving prison officials were unsigned. Doc. 52-4 at 52. Ms. Gilmore asked Lieutenant Milton why she was being searched, but Milton would not tell her. *Id.* at 57. Ms. Gilmore then asked to speak

to Lieutenant Milton's supervisor, but Milton stated that she was in charge that day so she was the most senior official with whom Ms. Gilmore could speak. *Id.* Lieutenant Milton informed Ms. Gilmore that she needed to sign the approval form or she would go to jail and would be unable to visit Mr. Sheets again. *Id.* at 52. Ms. Gilmore refused to sign the form, *id.* at 55, and Lieutenant Milton replied, "Well, you don't have to, but if you don't, then you'll go to jail. And we'll search you anyway." *Id.* at 52–53; *see also id.* at 55–56. Eventually, Ms. Gilmore succumbed and signed the form. As she explained, "I'm going to go to jail if I don't agree to it. And then even if I don't agree, I'm still going to get strip-searched when I go to jail. So at that point I didn't feel like I had an option to do it or not." *Id.* at 56. The Defendants testified only that they presented the consent form to Ms. Gilmore, and she signed it, but they have not denied Ms. Gilmore's account of their coercion in having her sign the form. Doc. 50-5 at 3, Doc. 50-6 at 3.

The parties agree that Defendants then conducted the strip search. Lieutenant Milton and Officer Irizarry led Ms. Gilmore into the women's bathroom. Doc. 52-4 at 58. Once inside the bathroom, the officers told Ms. Gilmore to remove her clothes, and Ms. Gilmore removed her outer garment while leaving on her bra and underwear. *Id.* at 59. Lieutenant Milton responded, "You need to remove everything." *Id.* Ms. Gilmore responded, "Everything?" *Id.* And Lieutenant Milton

10

repeated, "You need to remove everything." *Id.* Embarrassed, Ms. Gilmore

removed her bra and underwear, and the officers began to search her. *Id.* at 60–61.

According to Ms. Gilmore, Officer Irizarry donned gloves and, at Lieutenant

Milton's direction, began the search by feeling Ms. Gilmore's breasts "like how

you do a patdown," then lifting each breast and looking underneath it. *Id.* at 61–63.

Officer Milton then ordered Ms. Gilmore to "[t]urn around," "bend over," and

"open your butt cheeks." *Id.* at 62–63. While Ms. Gilmore was in that position,

Officer Irizarry took her hand and "felt in between [Ms. Gilmore's] butt cheeks."

*Id.* at 63. The officers also required Ms. Gilmore to "spread her . . . vagina." *See*

Doc. 52-7 at 3; Doc. 25 at 10. For their part, Defendants testified that they did not

physically touch Ms. Gilmore, and that they simply directed her to remove her

clothes, to lift her breasts, and to turn and bend forward at the waist. Doc. 50-5 at

3; Doc. 50-6 at 3.

The strip search lasted about ten to fifteen minutes and showed that Ms.

Gilmore had no contraband on her person or in her clothing. *See, e.g.*, Doc. 50-5 at

3; Doc. 50-6 at 3.

After the search, Officer Irizarry led Ms. Gilmore back to the visitation

room. Doc. 52-4 at 64. Ms. Gilmore stayed with Mr. Sheets until visitation ended

at 3 p.m. to avoid being by herself, but the two did not really talk. *Id.* at 65. In

shock, she "was tearing up" and "just kind of sat there." *Id.* at 64–65. She finally

broke down when she got to her car and cried throughout the drive home. *Id.* at 65, 71.

Two days later, Ms. Gilmore called Deputy Warden Tamarshe Smith to complain about the strip search and to ask why she had been searched. *Id.* at 74–75; Doc. 50-3 at 4; Doc. 50-11. Deputy Warden Smith gave Ms. Gilmore the impression that he did not know about the search, but promised to look into it and asked her to call back a few days later. Doc 52-3 at 3; Doc. 50-11. Ms. Gilmore testified that she spoke to Deputy Warden Smith again a few days later, and he apologized and informed her that he had watched video from the visitation room and "said that he did not see anything on the video that would warrant a strip search." Doc. 52-3 at 3; Doc. 52-4 at 74. Deputy Warden Smith denies this second conversation, testifying that after he reviewed the incident report, which "did not reveal any issues related to the strip search," Ms. Gilmore did not call him back, and the two never spoke again. *See* Doc. 50-3 at 5.

## II.    PROCEDURAL HISTORY

Ms. Gilmore filed a complaint against the Defendants on November 20, 2018, *see* Doc. 1, and filed an amended complaint on May 29, 2019. *See* Doc. 25. She alleged that the Defendants' conduct violated her Fourth Amendment rights and gave rise to several state-law claims. *See id.* at 7–15. The Defendants filed a partial motion to dismiss on June 19, 2019, *see* Doc. 27, and the District Court

granted the motion on December 9, 2019, dismissing Ms. Gilmore's state-law claims. *See* Doc. 37.

Defendants moved for summary judgment on Ms. Gilmore's Fourth Amendment claim on January 14, 2022. *See* Doc. 50. They argued that the proper legal standard for assessing Defendants' strip search of Ms. Gilmore was reasonable suspicion, *see, e.g.*, Doc. 50-1 at 14 ("[I]t appears the appropriate standard to be applied is reasonable suspicion."); *see also id.* at 12 (describing reasonable suspicion as the "correct standard"), though they acknowledged that some Eleventh Circuit case law supported a "higher" standard for "physically invasive strip searches." *See id.* at 17. Defendants asserted that the District Court should credit their testimony about why they conducted the search—despite being the moving party—and grant them qualified immunity because the search was supported by reasonable suspicion. *See id.* at 12–18 (arguing that the search did not violate the Fourth Amendment because of reasonable suspicion); 18–20 (arguing that the search did not violate clearly established law because of reasonable suspicion).

Ms. Gilmore opposed Defendants' motion, arguing that summary judgment was inappropriate because the record revealed genuine disputes of material fact as to whether Defendants possessed reasonable suspicion for their search. *See* Doc. 52 at 1. Ms. Gilmore presented evidence that Defendants' stated bases for the search

13

were untrue and thus, for purposes of summary judgment, Defendants strip searched Ms. Gilmore "without any suspicion or justification whatsoever." *See id.* at 2. Such a search violated Ms. Gilmore's clearly established rights under the Fourth Amendment, and summary judgment was therefore inappropriate. *See id.* at 5–12. The motion was referred to the Magistrate Judge to prepare a report and recommendation.

The Magistrate Judge asked for supplemental briefing on whether Defendants had established that they were acting within the scope of their discretionary authority when they strip searched Ms. Gilmore. Doc. 62. Defendants filed a supplemental brief arguing that, on their version of the facts, they followed procedures in conducting the strip search. Doc. 63. Defendants did not argue that, if Ms. Gilmore's account was credited, they complied with GDC regulations. *Id.* Ms. Gilmore did not file a supplemental brief.

Although the Magistrate Judge found that the questions of why and in what manner Defendants searched Ms. Gilmore were "strenuously contested," Doc. 64 at 4, he nonetheless recommended that Defendants' motion be granted. *Id.* at 32–33. The Magistrate Judge's decision hinged on his determination that both parties misapprehended the relevant legal standard. In the Magistrate Judge's view, no case law clearly established that prison officials must have any suspicion to conduct an invasive strip search of a prison visitor. *See id.* at 13–22. The

14

Magistrate Judge acknowledged that myriad court decisions had imposed a reasonable suspicion standard but viewed those decisions as inapposite because they predated the Supreme Court's decision in *Florence v. Board of Chosen Freeholders*—a case that permitted a blanket policy of suspicionless visual strip searches for a narrow class of incarcerated individuals. According to the Magistrate Judge, the Supreme Court's "recognition of permission for strip searches on less than reasonable suspicion" for a subset of incarcerated individuals meant that the law had not clearly established a reasonable suspicion standard for anyone inside prison facilities. Doc. 64 at 17. As a result, the Magistrate Judge also ruled that no case law clearly established that the strip search exceeded the contours permitted by the Fourth Amendment. *Id.* at 25.

Plaintiff objected to the Magistrate Judge's report and recommendation, arguing that case law clearly established that suspicionless searches of prison visitors violated the Fourth Amendment and that the invasive character of the strip search exceeded the limits imposed by the Fourth Amendment. *See* Doc. 66. The District Court noted that Plaintiff's arguments about the proper legal standard were "plausible," Doc. 70 at 5–7, and added that it—like the Magistrate Judge—was "'not unsympathetic to Plaintiff's argument that reasonable suspicion should be required before subjecting a prison visitor to a strip search.'" *Id.* at 7 (quoting Doc. 64 at 23) (emphasis in original).  But the District Court adopted the Magistrate

15

Judge's report and recommendation and granted summary judgment to the Defendants, finding that Plaintiff failed to prove that clearly established law forbade the search. *See* Doc. 70. And the District Court chose not to address the constitutional question of whether the Fourth Amendment required reasonable suspicion, relying instead on its conclusion that clearly established law imposed no such requirement. *See id.* Plaintiff filed a timely notice of appeal. *See* Doc. 72. [2]

## SUMMARY OF THE ARGUMENT

The District Court's adoption of the Magistrate Judge's report and recommendation should be reversed. Under longstanding precedent from this Court, the Fourth Amendment prohibits *any* search that is either unjustified at its inception or excessive in scope. In order to conduct a strip search of a civilian visitor, a correctional officer must have at least reasonable suspicion, based on specific and articulable facts, that the visitor is attempting to smuggle contraband underneath their clothing. And even when the Fourth Amendment permits some kind of a strip search, it does not permit unduly invasive methods, such as making physical contact with a person's buttocks. Taking the record in the light most favorable to Ms. Gilmore, Defendants violated both these restrictions: they

---

[2] Although Ms. Gilmore initially filed her notice of appeal as to all Defendants on all issues decided by the District Court, she now clarifies that she does not appeal that portion of the District Court's order finding insufficient evidence of supervisory liability as to Defendant Smith.

16

searched her based on no suspicion at all, and did so in a highly invasive fashion, physically manipulating her breasts, ordering her to spread her vagina, and then feeling between her buttocks.

The District Court erred in three separate respects when it ruled that Defendants were entitled to qualified immunity. First, because Defendants violated express regulations restricting their authority to conduct strip searches, they are categorically ineligible for qualified immunity. Second, the District Court interpreted *Florence* as allowing a reasonable officer to determine that suspicionless searches are justified of anyone in a prison. But *Florence* specifically limited its holding to blanket policies permitting suspicionless visual strip searches of arrestees who were joining the general population of a jail. Because Defendants' strip search of Ms. Gilmore was not made pursuant to a blanket policy, Ms. Gilmore was not herself an incarcerated person joining the general population of a jail, and Defendants went far beyond a visual strip search by physically manipulating Ms. Gilmore's breasts, directing her to spread her vagina, and feeling between her buttocks, *Florence* is wholly inapposite here. Third, even if *Florence* could be read to apply beyond its facts and the Supreme Court's clear statements limiting its application, Defendants' conduct here was so categorically extreme as to warrant the denial of qualified immunity.

17

## STANDARD OF REVIEW

This Court reviews the District Court's summary judgment decision *de novo*. *See Burton v. Tampa Hous. Auth.*, 271 F.3d 1274, 1276–77 (11th Cir. 2001). In doing so, this Court "accept[s] [Ms. Gilmore's] version of the facts as true, affording all justifiable inferences to [her]." *Sconiers v. Lockhart*, 946 F.3d 1256, 1260 (11th Cir. 2020). "Then, [the Court] determine[s] whether, based on this version of the facts, Defendants are entitled to qualified immunity." *Alcocer v. Mills*, 906 F.3d 944, 950 (11th Cir. 2018). The Supreme Court has stressed "the importance of drawing inferences in favor of the nonmovant, even when, as here, a court decides only the clearly-established prong of the standard." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014).

## ARGUMENT

Because strip searches are "embarrassing, frightening, and humiliating," they involve a "categorically extreme intrusiveness" into "both subjective and reasonable societal expectations of personal privacy . . . ." *Safford United Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 374–76 (2009). They thus "implicate[] the rule of reasonableness" under the Fourth Amendment. *T.R. ex rel. Brock v. Lamar Cnty. Bd. of Educ.*, 25 F.4th 877, 883–84 (11th Cir. 2022). Defendants violated that rule when they strip searched Ms. Gilmore, manipulated her breasts, and probed between her buttocks, without a shred of evidence that she had done anything

18

wrong. And Defendants cannot claim qualified immunity to shield their misconduct for two independent reasons. First, because Defendants violated unambiguous prison regulations in conducting the search, they acted outside of their discretionary authority and cannot meet their threshold burden. Second, the Defendants had fair notice that the Fourth Amendment did not permit them to strip Ms. Gilmore naked, inspect her genitals, and manipulate her breasts and buttocks with no suspicion whatsoever. This notice was provided by decades of opinions from this Court, the Supreme Court, and other circuits holding that, outside the narrow context identified by *Florence*, strip searches may be conducted only upon specific reasonable suspicion that an individual is hiding contraband inside their clothing, and by prison regulations that forbade the Defendants from conducting even visual strip searches without reasonable suspicion.

## I.     DEFENDANTS VIOLATED MS. GILMORE'S FOURTH AMENDMENT RIGHTS WHEN THEY STRIP-SEARCHED HER WITHOUT REASONABLE SUSPICION AND USED UNREASONABLY INTRUSIVE MEASURES

In assessing whether any search is constitutional under the Fourth Amendment, this Court's "inquiry is a dual one." *May v. City of Nahunta*, 846 F.3d 1320, 1328 (11th Cir. 2017). "First, [the Court] must consider whether the action was justified at its inception; second, [the Court] must determine whether the search as actually conducted was reasonably related in scope to the circumstances." *T.R.*, 25 F.4th at 883. Defendants' conduct fails at both steps.

19

### A. Because There Was No Evidence Ms. Gilmore Had Drugs Inside Her Clothing, the Search Was Not Justified at Its Inception.

Across myriad contexts, this Court has held that strip searches are only justified at their inception if officials, "considering all the facts surrounding the [plaintiff] and her [visit], reasonably suspect that the [plaintiff] is smuggling contraband." *Brent v. Ashley*, 247 F.3d 1294, 1300 (11th Cir. 2001) (strip search by customs agent at port of entry). "Put differently, we are confident that an officer must have at least a reasonable suspicion that the strip search is necessary for evidentiary reasons." *Evans v. Stephens*, 407 F.3d 1272, 1279 (11th Cir. 2005) (strip search of arrestees brought to a precinct).[3] Because a "strip search [i]s 'categorically distinct' from a search of outer clothing and belongings based on 'subjective and reasonable societal expectations of personal privacy,' [it is] in a category of its own demanding its own specific suspicions." *T.R.*, 25 F.4th at 886 (quoting *Safford*, 557 U.S. at 374) (strip searches of students in school). A strip search needs "specific suspicion that [the person searched] was hiding drugs under her clothing," not simply a "general background possibility . . . ." *Id.* at 886;

---

[3] This Court continued in *Evans* that "[p]erhaps the actual standard is higher than reasonable suspicion, especially where" the search is particularly invasive. 407 F.3d at 1279-80. In *Evans*, the Defendant's search involved much more than a visual strip search, and included "touching genitalia and penetrating anuses." *Id.* Ms. Gilmore's strip search included Officer Irizarry lifting each of Ms. Gilmore's breasts and feeling between her buttocks, and thus may have required even more than reasonable suspicion.

*accord Brent*, 247 F.3d at 1300 ("[R]easonable suspicion to justify a strip search can *only* be met by a showing of articulable facts which are particularized as to the place to be searched . . . ." (citations omitted)). These unambiguous pronouncements—even in contexts where individuals possess reduced expectations of privacy—make clear the general rule: reasonable suspicion is the minimum requirement before a civilian may be strip searched. And, as every circuit to address the question has held for decades, this well-established rule applies with equal force to civilians visiting a prison. *See, e.g.*, *Wood v. Clemons*, 89 F.3d 922, 928 (1st Cir. 1996); *Varone v. Bilotti*, 123 F.3d 75, 79 (2d Cir. 1997); *Thorne v. Jones*, 765 F.2d 1270, 1276–77 (5th Cir. 1985); *Daugherty v. Campbell*, 33 F.3d 554, 556 (6th Cir. 1994); *Hunter v. Auger*, 672 F.2d 668, 674 (8th Cir. 1982); *Romo v. Champion*, 46 F.3d 1013, 1020 (10th Cir. 1995), *cert denied*, 516 U.S. 947 (1995).

Indeed, Defendants themselves agreed below that the reasonable suspicion standard applies based on SSP's policy and controlling precedent. SSP's Entry Security Standard Operating Procedure ("Entry Security SOP") Policy 226.02(VI)(A)(8) allows for a strip search only if reasonable suspicion is found. Doc. 50-2 ⁋⁋ 9-11, 33-34 ("ALL persons may be subject to strip searches if reasonable suspicion is found"); *see also* Doc. 52-9 at 8 ("Probable Cause and Reasonable Suspicion . . . [r]efers to the requirement of law that there exists an

adequate reason to . . . conduct searches . . . ."). Defendants argued below that "Entry Security SOP has set the correct standard – reasonable suspicion." Doc. 50-1 at 12. Defendants further argued that controlling Supreme Court and Eleventh Circuit precedent supports this standard, as well as persuasive authority from other circuit courts. Doc. 50-1 at 12–14 (citing *United States v. Prevo*, 435 F.3d 1343 (11th Cir. 2006) and *Brent*). Based on these cases and SSP's own policies, Defendants agreed that "the question is whether the Defendants had 'reasonable suspicion' to perform the search." Doc. 50-1 at 14; *see also* Doc. 55 at 3 ("Plaintiff agrees with Defendants that this Circuit will likely adopt 'reasonable suspicion.'"). Indeed, nowhere did Defendants argue that *Florence v. Board of Chosen Freeholders*, 566 U.S. 318 (2012), changed the reasonable suspicion standard— because, as set forth more fully *infra*, Section II(B)(2), that case has no bearing on Ms. Gilmore's claim. Rather, that case dealt exclusively with the unique context of detainees being visually strip-searched during intake before joining the general population of a jail or prison, and indeed emphasized that they reached no further.

Taking the evidence in the light most favorable to Ms. Gilmore, as required at the summary judgment stage, the Defendants had no reasonable or specific suspicion that she was smuggling contraband underneath her clothing. Ms. Gilmore had passed through a metal detector, submitted to a pat-down, and gone through a full-body cavity scanner before starting the visit. Doc. 52-3 at 2; Doc.

22

52-4 at 20–21; *see also* Doc. 50-10 at 3–4. None of these searches revealed anything. *Id.* That "lack of revealed evidence undermines the reasonableness of [Defendants'] belief that [Ms. Gilmore] possessed drugs." *Evans*, 407 F.3d at 1280; *accord Brent*, 247 F.3d at 1301.

Ms. Gilmore did nothing during the visit to suggest she was smuggling drugs—she engaged in no disruptive behavior, unauthorized contact, or furtive movements. She just spent between thirty minutes and an hour talking with her husband before being pulled out of the room and strip searched. None of the four correctional officers who were involved in wanding Ms. Gilmore down, conducting a pat search of her clothing, putting her through the body scanner, or bringing her to the visitation area reported smelling any drugs on her. And Ms. Gilmore specifically stated that she did not smell like marijuana that morning and had not been in the presence of marijuana before or during her visit that morning. Indeed, in the two years she had been visiting the facility, she had never been suspected of carrying contraband. Defendants' own documentation, completed in real time, confirms that they had no specific facts supporting their suspicion. Doc. 52-5 at 8–10. Rather, these nondescript reports contain just the nebulous and conclusory statement that Ms. Gilmore was "under suspicion for carrying contraband." *Id.* at 10.

Indeed, taken in the light most favorable to Ms. Gilmore, Defendants initiated the strip search solely because Lieutenant Milton felt disrespected by Ms. Gilmore. This Court has long recognized that where strip searches "are devoid of penological merit and imposed simply to inflict pain, the federal courts should intervene." *Harris v. Ostrout*, 65 F.3d 912, 916 (11th Cir. 1995); *accord Florence*, 566 U.S. at 339 (noting that announced rule did not apply to "officers engaging in intentional humiliation or other abusive practices"); *Hudson v. Palmer*, 468 U.S. 517, 530 (1984) (noting that even lessened privacy interests of an incarcerated person "does not mean that he is without a remedy for calculated harassment unrelated to prison needs"). Thus, even if Defendants had possessed *some* suspicion that Ms. Gilmore possessed contraband—which they did not—their retaliatory and punitive purpose for the strip search nonetheless rendered the search unreasonable. *See, e.g.*, *Cochrane v. Quattrocchi*, 949 F.2d 11, 13–14 (1st Cir. 1991) (reversing grant of summary judgment on Fourth Amendment claim because "fragile" factual basis for reasonable suspicion was "overcome by a finding of retaliatory motive" for strip search); *Mays v. Springborn*, 719 F.3d 631, 634 (7th Cir. 2013) (noting relevance of retaliatory motive in assessing reasonableness of strip search).

Defendants' strip search of Ms. Gilmore was not based on reasonable suspicion and thus was not justified at its inception.[4] But even if there were some factual basis for Defendants' suspicion of Ms. Gilmore, their improperly punitive motive would still render the search unjustified at its inception.

### B.    Defendants Conducted the Search in an Abusive Manner That Was Not Reasonably Related to the Circumstances.

Under clearly established law, a strip search that is justified at its inception still violates the Fourth Amendment if it is not conducted in a manner that is "reasonably related to the objectives of the search" or if it is "excessively intrusive . . . ." *T.R.*, 25 F.4th at 883. In determining the reasonableness of the manner of a strip search, courts consider "the scope of the particular intrusion, the manner in which it is conducted, . . . and the place in which it is conducted." *Powell v.*

---

[4] Although not necessary to decide in this appeal, it bears noting that even Defendants' version of the facts does not satisfy the exacting requirements for strip searches established by the Supreme Court and this Court. Even if a jury credits Officer Lupo's testimony, Defendants knew only two facts when they decided to strip search Ms. Gilmore: (1) Officer Lupo had smelled marijuana and (2) Ms. Gilmore had been focusing on Officer Lupo during the visit. Doc. 50-4 at 2–3. But this Court just last year affirmed that such facts give rise to only a "general background possibility" of drug possession, and are not sufficient to justify a visual strip search. *T.R.*, 25 F.4th at 885. There, school officials argued they had reasonable suspicion to strip search a student because a teacher smelled marijuana, teachers found drug paraphernalia in the student's backpack, and other students reported observing the student smoking—undoubtedly more evidence than Defendants here possessed. *Id.* Yet this Court without hesitation held that those facts created only a "general possibility [which] is insufficient when considering 'the categorically extreme intrusiveness'" of a strip search. *Id.* (quoting *Safford*, 557 U.S. at 376).

*Barrett*, 541 F.3d 1298, 1305 (11th Cir. 2008) (*quoting Bell v. Wolfish*, 441 U.S. 520, 559 (1979). Courts also consider the availability of less intrusive alternatives. *See, e.g.*, *D.H. ex rel. Dawson v. Clayton Cnty. Sch. Dist.*, 830 F.3d 1306, 1317–18 (11th Cir. 2016) (finding that strip search, while justified at inception, was excessive in scope).

Defendants' strip search of Ms. Gilmore was excessive for two separate reasons. First, Defendants went far beyond a visual strip search when they physically lifted Ms. Gilmore's breasts, directed her to spread her genitals, and then placed a hand between her buttocks and felt around. This sort of nonconsensual physical intrusion into a person's body implicates the "most personal and deep-rooted expectations of privacy." *Winston v. Lee*, 470 U.S. 753, 760 (1985). This Court has noted that the "personal indignity" of a strip search is exacerbated when there is "physical contact between the searcher and the person searched." *United States v. Touset*, 890 F.3d 1227, 1234 (11th Cir. 2018). In other words, for Fourth Amendment purposes, "[i]t matters that a body cavity search was undertaken." *Evans*, 407 F.3d at 1281. Because Defendants' conduct far exceeded any strip search this Court has ever sanctioned, their strip search of Ms. Gilmore was excessive in scope.

Second, Defendants had alternative, less intrusive mechanisms for preventing the flow of contraband into the prison at their disposal. For example,

26

they could simply have denied Ms. Gilmore's visitation or terminated her visit at any point when they developed a suspicion that she was carrying contraband. Indeed, GDC regulations expressly note that correctional officers have the power to deny a visit or immediately terminate an ongoing visit upon suspicion or identification of contraband. Doc. 52-11 at 18, 21. And at least one court has held that correctional officers *must* afford visitors the opportunity to leave before conducting a strip search, even if there is reasonable suspicion that the visitor bears contraband. *Cates v. Stroud*, 976 F.3d 972, 981 (9th Cir. 2020). Defendants also could have limited the search to a visual inspection and asked Ms. Gilmore to lift her own breasts or spread her own buttocks. Instead, they immediately decided to grab and touch the most private parts of her body for no reason.

Each one of these factors individually would be sufficient to find that Defendants' strip search of Ms. Gilmore was excessive in scope irrespective of whether a strip search would have been justified at its inception. Taken together, the manner in which Defendants strip-searched Ms. Gilmore—physically intruding on her most fundamental bodily autonomy despite readily available alternatives— plainly violated Ms. Gilmore's Fourth Amendment rights.

## II. DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY FOR STRIP SEARCHING MS. GILMORE

Because officials do not enjoy the protections of qualified immunity when they act outside the scope of their authority under state law, they bear the burden of

27

proving that their challenged conduct occurred while they were "exercising powers that legitimately form a part of their jobs." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1266–67 (11th Cir. 2004). And even if an official meets this burden, they are not entitled to qualified immunity when they have "violated a federal statutory or constitutional right" that was "clearly established" at the time of the violation. *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018). In making these determinations, courts must be scrupulous about construing the record in the light most favorable to the nonmovant. *Tolan*, 572 U.S. at 657 ("Our qualified-immunity cases illustrate the importance of drawing inferences in favor of the nonmovant, even … [on] the clearly-established prong of the standard.").

Construed properly, Defendants' claim for qualified immunity fails at both steps. First, taken in the light most favorable to Ms. Gilmore, Defendants violated unambiguous restrictions on their authority, and are thus not entitled to qualified immunity. The District Court ignored key factual disputes—and three provisions in GDC's own operating regulations restricting officials' ability to conduct strip searches—in holding otherwise. Second, even if Defendants had acted within the scope of their authority, their conduct violated clearly established law. Unanimous authority from this Court and its sister circuits has long made clear that the Fourth Amendment requires at least reasonable suspicion for strip searches of anyone other than a detainee joining the general population of a jail. Because *Florence*, by

28

its own terms, did not disturb that rule, it applies to Ms. Gilmore. Indeed, the

Georgia Department of Corrections has codified that requirement in its binding

regulations, and Defendants expressly argued for a reasonable suspicion standard

in their briefing to the District Court. Defendants were thus on fair notice that

conducting a highly invasive strip search without any justification violated the

Fourth Amendment. The District Court's reliance on an inapposite line of cases to

hold otherwise was error.

### A.     The District Court Plainly Erred in Finding Defendants Acted Within the Scope of Their Discretionary Authority Because They Violated Express Restrictions on Their Authority.

Qualified immunity protects government officials from suit "only when

exercising powers that legitimately form a part of their jobs." *Holloman*, 370 F.3d

at 1267. In order to prove that challenged conduct "legitimately form[s] a part of

their jobs," Defendants must show that they were "(a) performing a legitimate job-

related function (that is, pursuing a job-related goal), (b) through means that were

within [their] power to utilize." *Id.* at 1265. Thus, Defendants bore the burden

below of showing *both* that strip-searching Ms. Gilmore involved a job-related

goal *and* that the strip search was conducted within the scope of their powers. But

in assessing whether Defendants met their burden, the Magistrate Judge erred by

improperly crediting Defendants' version of disputed facts—namely, that

Lieutenant Milton actually sought and received authorization from Deputy Warden

29

Smith before strip-searching Ms. Gilmore—and ignoring other unambiguous provisions of GDC regulations. Although Ms. Gilmore did not object to this portion of the Magistrate Judge's report and recommendation, reversal is still appropriate under plain error review.[5]

Under plain error review, this Court "will consider an issue not raised in the district court if it involves a pure question of law, and if refusal to consider it would result in a miscarriage of justice." *Burch v. P.J. Cheese, Inc.*, 861 F.3d 1338, 1352 (11th Cir. 2017). In such cases, "[this] Court has not been particularly strict in the application of the 'miscarriage of justice' requirement." *Blue Martini Kendall, LLC v. Miami Dade Cnty., Fla.*, 816 F.3d 1343, 1350 (11th Cir. 2016). Rather, the core inquiry is whether there has been a "decision or outcome of a legal proceeding that is prejudicial or inconsistent with the substantial rights of a party." *Id.* Under this standard, unambiguous errors of law are plain. *See, e.g.*, *Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1018 (11th Cir. 2004) (jury instruction that omitted necessary element of claim was plain error); *Adrienne Roggenbuck Tr. v. Dev. Res. Grp., LLC*, 505 F. App'x 857, 861 (11th Cir. 2013) (granting summary judgment by superimposing extraneous elements onto claim was plain error).

---

[5] A party's failure to object to a portion of a report and recommendation by a magistrate judge still allows this Court to review for plain error. 11th Cir. L.R. 3-1.

The determination of whether Defendants were acting within the scope of their discretionary authority is a pure question of law that turns on restrictions on their powers under state law. *See Est. of Cummings v. Davenport*, 906 F.3d 934, 939–40 (11th Cir. 2018) (exercising jurisdiction over interlocutory appeal to "look to state law to determine the scope of a state official's discretionary authority"). State regulations also dictate the bounds of officials' authority. *See Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1283 (11th Cir. 1998) (considering both Alabama statutes and agency regulations). And where officials exceed clear restrictions on their authority under state law, this Court has recognized that qualified immunity is not an available defense. *See Est. of Cummings*, 906 F.3d at 941–42 (denying qualified immunity to prison warden who entered do-not-resuscitate order for incarcerated individual despite clear Alabama law proscribing such decisions); *Lenz v. Winburn*, 51 F.3d 1540, 1547 (11th Cir. 1995) (finding that guardian ad litem exceeded the scope of her discretionary authority by exceeding limits on her role under Florida law).

Here, that inquiry is dispositive. While conducting strip searches to screen for contraband is a legitimate job-related function of correctional officers, the record viewed in the light most favorable to Ms. Gilmore shows that Defendants violated *three* express restrictions codified in GDC regulations, and are thus categorically ineligible to receive qualified immunity.

31

First, GDC regulations provide unambiguous procedures that must be followed in order to conduct a strip search: "No strip search shall be conducted until the Strip Search Approval Form . . . is signed by . . . [Deputy Warden Smith] or Officer in Charge with verbal approval of [Deputy Warden Smith]." Doc. 52-8 at 5. And, taking the facts in the light most favorable to Ms. Gilmore, Deputy Warden Smith was not working on the day she was strip searched, Doc. 52-14, and "didn't even know about [the strip search] when [Ms. Gilmore] spoke with him" two days after the fact, Doc. 52-4 at 79. As Ms. Gilmore argued, these facts would allow a reasonable jury to infer that Lieutenant Milton and Officer Irizarry did not contact Deputy Warden Smith for approval before strip-searching Ms. Gilmore. Doc. 52 at 20–21.

Second, GDC regulations limit the scope of strip searches to *visual* inspections of the body, making clear that "[b]ody cavity and other invasive searches are prohibited." Doc No. 52-8 at 6. While the policy does not define "other invasive searches," the phrase must be interpreted in light of its context. *Butterworth v. Bowen*, 796 F.2d 1379, 1388 (11th Cir. 1986). The term thus means something other than body cavity searches. And the preceding section of the regulations, which govern physical contact made during pat down searches, expressly note that "[s]trip searches shall not be conducted using this procedure." Doc. 52-8 at 5. Taken together, these provisions indicate—at least, they would

32

allow a jury to infer—that physical contact during strip searches is categorically impermissible. And even if some degree of physical contact *might* be permissible, there is no read of the prohibition on "invasive searches" that would authorize physically manipulating Ms. Gilmore's breasts and inserting a hand between her buttocks and feeling around.

Third, GDC's entry procedures unambiguously note that "[w]ritten consent [is] required" to perform a strip search. Doc. 52-9 at 18. And the record taken in the light most favorable to Ms. Gilmore makes clear that Defendants did not obtain valid consent here. If a jury believes Ms. Gilmore, Defendants coerced her to sign the consent form by threatening to arrest her and strip search her anyway if she refused. Doc. 52-4 at 52, 55–56. On this version of the facts, Defendants did not obtain consent before conducting the strip search, as "'[c]onsent' that is the product of official intimidation or harassment is not consent at all." *Florida v. Bostick*, 501 U.S. 429, 438 (1991).

In sum, a reasonable jury could find that Defendants disregarded three separate and unambiguous restrictions on the procedures for conducting strip searches when they decided to strip search Ms. Gilmore without seeking prior approval, without valid consent, and by physically grabbing Ms. Gilmore's breasts and buttocks. The Magistrate Judge's contrary decision improperly credited

33

Defendants' testimony about the procedures followed for the search, and the District Court's adoption of that decision was plain error.

### B. It Has Long Been Clearly Established that Strip Searches Require Reasonable Suspicion and Cannot Be Excessively Intrusive.

Even if Defendants had acted within their discretionary authority, the District Court erred in finding that a reasonable correctional officer could believe that the Fourth Amendment permitted them to strip search Ms. Gilmore without any reasonable or individualized suspicion and through abusive means. In assessing an official's entitlement to qualified immunity, "[t]he salient question is whether the state of the law at the time of an incident provided fair warning to the defendants that their alleged conduct was unconstitutional." *Tolan*, 572 U.S. at 656 (cleaned up). Fair warning can be established in different ways. A plaintiff may, for example, identify "controlling authority or a robust consensus of persuasive authority" clearly establishing a constitution right. *Glasscox v. City of Argo*, 903 F.3d 1207, 1217 (11th Cir, 2018). Alternatively, they may "show[] that the official's conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official." *Cantu v. City of Dotham*, 974 F.3d 1217, 1232 (11th Cir. 2020). In such situations,

an officer is not entitled to qualified immunity even without case law involving identical facts—the legal rule itself is dispositive.[6]

Under either approach, Defendants are not entitled to qualified immunity here. Longstanding case law from the Supreme Court and all courts of appeal clearly establish that strip searches of visitors in a prison require at least reasonable suspicion. In finding otherwise, the District Court overread a single Supreme Court decision that expressly was limited to a blanket policy of visually strip searching incarcerated individuals who would be joining the general population of a jail after immediate contact with the outside world. Additionally, courts have long recognized that strip searches in *all* contexts must be reasonable in scope, and cannot be excessively intrusive. And even if the case law were not as clear as it is, the violation of law here was obvious. Case law, GDC's own regulations, and common sense should have made clear that correctional officers cannot strip search a woman who was not incarcerated, manipulate her breasts and buttocks, and direct her to spread her genitals without *any* suspicion that she possessed contraband.

---

[6] This Court has, at times, explained these as separate avenues to defeating qualified immunity. *See, e.g.*, *D.H. ex rel.Dawson v. Clayton Cnty. Sch. Dist.*, 830 F.3d 1306, 1318 (11th Cir. 2016). But at core, the inquiry remains the same: whether defendants violated either clear decisional law or obvious rights. *Powell v. Snook*, 25 F.4th 912, 920–21 (11th Cir. 2022).

>    1.    *Supreme Court and circuit authority clearly establish the need for at least reasonable suspicion before a prison visitor may be strip-searched.*

It is well-settled that "[d]etermining the reasonableness of *any search* involves a twofold inquiry" starting with "whether the . . . action was justified at its inception." *New Jersey v. T.L.O.*, 469 U.S. 325, 341 (1985) (emphasis added) (ellipsis in original). For a strip search to be justified at its inception, there must be, at a minimum, reasonable suspicion that an individual possesses contraband in the areas stripped. *See, e.g.*, *Safford*, 557 U.S. at 370 (strip searches of students for alleged marijuana possession require reasonable suspicion); *Brent*, 247 F.3d at 1300 (strip searches by customs agents searching for contraband at ports of entry require reasonable suspicion); *Evans*, 407 F.3d at 1279 (noting, in the context of arrestees being searched at precinct, that "an officer must have at least a reasonable suspicion that the strip search is necessary" although "[p]erhaps the actual standard is higher"); *T.R.*, 25 F.4th at 888 (strip searches of student for alleged marijuana possession required reasonable suspicion that marijuana was hidden inside underwear). And for decades, every circuit to address the question has applied that same standard applies to civilians visiting a prison. *See, e.g.*, *Wood v. Clemons*, 89 F.3d 922, 928 (1st Cir. 1996); *Varone v. Bilotti*, 123 F.3d 75, 79 (2d Cir. 1997); *Thorne v. Jones*, 765 F.2d 1270, 1276–77 (5th Cir. 1985); *Daugherty v. Campbell*, 33 F.3d 554, 556 (6th Cir. 1994); *Hunter v. Auger*, 672 F.2d 668, 674 (8th Cir.

1982); *Romo v. Champion*, 46 F.3d 1013, 1020 (10th Cir. 1995), *cert denied*, 516

U.S. 947 (1995).

> 2.    *The only exception to the requirement of reasonable suspicion is for incarcerated persons immediately following contact with the free world, who may be visually strip searched pursuant to a nondiscretionary policy.*

Over the last half century, courts have created just a single exception in

which reasonable suspicion is not required for a strip search in a prison: blanket

policies for visually strip-searching incarcerated persons immediately after their

contact with the free world.

> a.    Incarcerated persons joining a jail's general population may be strip searched without individualized reasonable suspicion.

In *Bell v. Wolfish*, 441 U.S. 520 (1979), the Supreme Court upheld a blanket

policy of strip-searching incarcerated people rejoining general population

immediately after contact visits with free citizens for two reasons. First, the Court

noted, detainees have diminished expectations of privacy compared to members of

the free public under the Fourth Amendment; "[l]oss of . . . privacy [is] [an]

inherent incident[] of confinement" in a prison. *Id.* at 537. Second, the Court found

persuasive record evidence that "both convicted prisoners and pretrial detainees"

attempt to bring "secret[] [contraband items] into the facility by concealing them in

body cavities . . . ." *Id.* at 558–59.

This Court approved of "exactly what . . . *Bell* . . . recognized would be reasonable" in *Powell v. Barrett*, upholding a policy under which correctional officials conducted blanket visual strip-searches of arrestees being booked to join the general population of a jail. 541 F.3d at 1313. In so holding, this Court too relied on evidence about the extent of "smuggling of contraband by inmates accused of misdemeanors as well as those accused of felonies." *Id.* at 1310.

Four years later, the Supreme Court reaffirmed *Bell* and cited *Powell* to authorize detention facilities to maintain a policy requiring "every detainee who will be admitted to the general population . . . to undergo a close visual inspection while undressed." *Florence,* 566 U.S. at 322. In doing so, the Court expressly noted that its ruling did not impact any other situations, such as "instances where . . . a detainee will be held without assignment to the general jail population . . . ." *Id.* at 338. To remove any ambiguity about the narrowness of the Court's decision, Justices Roberts and Alito wrote separately to "emphasize the limits of today's holding." *Id.* at 340 (Alito, J., concurring); *accord id.* (Roberts, J., concurring) (cautioning against reading majority too broadly "to ensure that we not embarrass the future"). Justice Alito noted that the Court's opinion addressed only "arrestees *who are committed to the general population of a jail*," *id.* (emphasis in original), and thus had no application even to "an arrestee whose detention has not been reviewed by a judicial officer and who could be held in available facilities apart

38

from the general population," *id.* at 341 (Alito, J., concurring). Four justices, in

dissent, expressed their view that intake strip searches must be treated the same as

all other strip searches—requiring reasonable suspicion—while also

acknowledging the case did not address any situations beyond its facts. *Id.* at 343–

44 (Breyer, J., dissenting).

Taken together, *Bell*, *Powell*, and *Florence* establish but one narrow

exception to the general rule requiring at least reasonable suspicion for strip

searches: incarcerated persons who are joining the general population of a facility

after contact with the free world may be subjected to a visual strip search, even

absent reasonable suspicion, pursuant to a blanket policy. In the years since

*Florence*, courts of appeals have roundly recognized its limited application,

denying qualified immunity to officers who conduct strip searches of arrestees who

are not joining the general population of a jail, *see Fonder v. Sheriff of Kankakee

Cnty.*, 823 F.3d 1144, 1146 (7th Cir. 2016); officers who conduct strip searches of

arrestees whose custodial status had not yet been decided, *see Hinkle v. Beckham

Cnty. Bd. of Cnty. Comm'rs*, 962 F.3d 1204, 1237 (10th Cir. 2020); and officers

who strip searched detainees who had not recently had contact with the free world,

*see Fugate v. Erdos*, No. 21-4025, 2022 WL 3536295, at *9 (6th Cir. Aug. 18,

2022); *Parkell v. Danberg*, 833 F.3d 313, 330 (3d Cir. 2016).

In other words, *Florence* did not even create ambiguity in the clearly established rule that reasonable suspicion is required for strip searches even of people who are arrested unless they are joining the general population of a jail or recently had contact with the free world. It certainly did not create ambiguity in the settled precedent that reasonable suspicion is required to strip searches visitors to a jail. As the Fourth and Ninth Circuits—the only courts of appeals to have directly considered the question since *Florence*—have recently reaffirmed, strip searches of visitors at a prison still require at least reasonable suspicion, and this is settled as a matter of clearly established law. *See Cates*, 976 F.3d at 980; *Calloway v. Lockey*, 948 F.3d 194, 202 (4th Cir. 2020).[7]

In sum, *Bell*, *Powell*, and *Florence* do not justify a suspicionless search of anyone other than a detainee joining the general population of a jail. They thus did nothing to disturb the well-settled, preexisting consensus that strip searches of prison visitors require at least reasonable suspicion.

---

[7] The Magistrate Judge determined that *Calloway* was not persuasive for two reasons. First, the Magistrate Judge noted that the parties in *Calloway* agreed that reasonable suspicion was the appropriate standard. Doc. 64 at 18. But here, too, Defendants agreed that reasonable suspicion was the correct standard. *See* Doc. 50-1 at 12, 14. Second, the Magistrate Judge read too much into one sentence of the *Calloway* opinion where the Fourth Circuit stated that it was "now mak[ing] clear" that the appropriate standard was reasonable suspicion. Doc. 64 at 18. But that was not an indication that the law was unsettled; indeed, the *Calloway* court cited the unanimity of authority predating *Florence* in support of its holding and went on to analyze whether the defendants possessed reasonable suspicion.

   b.    Blanket policies of suspicionless searches are treated
         differently than individual, discretionary suspicionless
         searches.

*Bell*, *Powell*, and *Florence* also share another common thread that renders

them wholly inapplicable to Ms. Gilmore's case: they dealt with whether a jail

could maintain a blanket policy of suspicionless searches for every detainee, rather

than whether a jail could subject an individual to an arbitrary and discretionary

suspicionless search. Under settled precedent, that distinction is significant.

The Supreme Court has long afforded greater latitude to policies of

suspicionless searches applicable to every individual in a specific situation, while

noting that discretionary searches conducted in the same situations can be

unconstitutional. *Compare, e.g.*, *Delaware v. Prouse*, 440 U.S. 648, 661, 663

(1979) (finding suspicionless sobriety check and search of single driver

unconstitutional because it stemmed from "standardless and unconstrained

discretion" while noting that "[q]uestioning of all oncoming traffic at roadblock-

type stops" would be permissible), *with Mich. Dep't of State Police v. Sitz*, 496

U.S. 444, 454 (1990) (distinguishing *Prouse* as involving "random stops" and

upholding checkpoint sobriety stops, which required all drivers passing through

designated checkpoints to be stopped and checked); *T.L.O.*, 469 U.S. at 341

(holding that reasonable suspicion is required for school official's individualized

decision to search a student for drugs), *with Veronia Sch. Dist. 47J v. Acton*, 515

41

U.S. 646 (1995) (distinguishing *T.L.O.* and upholding policy of blanket drug testing for student athletes without individualized suspicion). In explaining this distinction, the Supreme Court has explained that individualized suspicionless searches give too much discretion to officials, who would be free to "unfairly target members of unpopular groups." *Bd of Educ. of Indep. Sch. Dist. No. 92 v. Earls*, 536 U.S. 822, 837 (2002). *Florence* itself noted the significance of this distinction, finding that allowing for discretionary individualized strip searches could make the intake screening process "less effective, and likely less fair and evenhanded" and indeed "even give rise to charges of discriminatory application." 566 U.S. at 337.

Thus, *Bell*, *Powell*, and *Florence* rested on a long line of authority granting officials greater leeway to enact blanket policies of suspicionless searches while maintaining the requirement of at least reasonable suspicion for individualized, discretionary decisions to search a particular individual.

> 3.    *It is clearly established that invasive physical contact during a strip search is excessive in scope.*

Even if there were ambiguity surrounding the level of suspicion required before a prison visitor could be strip searched, it has long been settled that strip searches in all settings may not be conducted in an excessively intrusive manner. Indeed, *Bell* itself reaffirmed the point, taking care to note that it was approving only "visual body-cavity searches" while cautioning that strip searches

42

"conduct[ed] . . . in an abusive fashion . . . cannot be condoned." 441 U.S. at 560. Consistent with *Bell*, this Court subsequently held that a strip search of an arrestee that involved physical contact with an individual's buttocks and anus was unduly excessive in scope. *Evans*, 407 F.3d at 1281. Indeed, Defendants' conduct here parallels what this Court found unconstitutional in *Evans*; they "ordered [Ms. Gilmore] to use [her] hands to spread [her] buttocks . . . placing [a hand] between [her] buttocks." *Evans v. City of Zebulon*, 351 F.3d 485, 488 (11th Cir. 2003).

Again, nothing in *Powell* or *Florence* unsettled this bedrock principle.[8] In *Powell*, this Court recognized that suspicionless searches of detainees were permissible "provided that the searches are no more intrusive on privacy interests than those upheld in the *Bell* case." *Powell*, 541 F.3d at 1314. The Supreme Court was even more explicit in *Florence*, emphasizing that its holding did not impact "legitimate concerns about the invasiveness of searches that involve the touching of detainees." *Florence*, 566 U.S. at 339. Recognizing this key limit, courts have held that officers who make physical contact with arrestees while conducting strip searches during the intake process violate the Fourth Amendment. *See, e.g.*,

---

[8] This Court reaffirmed *Evans* well after *Powell* and *Florence*, denying qualified immunity to a male officer who forced a female detainee to remove her clothing at gunpoint—despite reasonable suspicion to justify the search at its inception—in light of "our prior holding that searches performed in an 'abusive fashion' may violate the Constitution . . . ." *May v. City of Nahunta*, 846 F.3d 1320, 1332 (11th Cir. 2017) (citing *Evans*, 407 F.3d at 1281).

43

*Williams v. City of Cleveland*, 771 F.3d 945, 953 (6th Cir. 2014) (denying qualified immunity and recognizing spraying incarcerated individuals' genitals and anus with delousing chemical constituted impermissible contact during suspicionless strip search); *accord United States v. Fowlkes*, 804 F.3d 954, 962 (9th Cir. 2015) (finding that officers violated Fourth Amendment by conducting a strip search during jail intake process by donning gloves and inserting hands into individual's rectum to recover plastic bag). Indeed, this Court has recognized that, even after *Florence*, searches involving physical contact implicate far greater Fourth Amendment concerns than visual inspections, or inspections of property. *Touset*, 890 F.3d at 1234.

Thus, under well-settled law in both this Circuit and others, strip searches that are unduly intrusive—such as ones that involve physical contact with an individual's genitals or buttocks—violate the Fourth Amendment *regardless* of whether such searches are justified at their inception. *Bell*, *Powell*, and *Florence* expressly limited their application to visual strip searches, and thus did not upset this fundamental idea.

> 4.  *The District Court ignored* Florence*'s own admonitions, turning it into an exception that swallows the rule.*

By their plain terms, *Bell*, *Powell*, or *Florence* simply have no applicability here because Ms. Gilmore was not a detainee, was not joining the general population of a jail, and was not merely subjected to a visual strip search pursuant

44

to a blanket policy. Rather, it is undisputed that Ms. Gilmore was a visitor meeting with a single individual, not a detainee joining the general population of Smith State Prison. Doc. 52-7 at 3. And, when taken in the light most favorable to Ms. Gilmore, the record establishes that Defendants physically grabbed her breasts and felt around between her buttocks while conducting the strip search.

In reaching a contrary conclusion, the District Court mistakenly held that the unanimous view of circuits requiring at least reasonable suspicion before a visitor could be strip searched had been supplanted by *Florence*. Doc. 64 at 17. In its view, "[i]f some strip searches are permissible upon less than reasonable suspicion, defendants' qualified immunity depends on whether Plaintiff identifies cases that establish that strip searches of prison visitors are not among them." Doc. 70 at 6. And in a single sentence, the District Court went on to summarily asserted "[n]one do." *Id.* That statement was error. The case establishing that *Florence* does not apply to strip searches of prison visitors is *Florence* itself. As discussed above, *Florence* did not create a hazy universe of situations where reasonable suspicion may not be required; rather, it carefully and repeatedly emphasized it was recognizing a limited exception to the reasonable suspicion requirement for just one class of cases involving strip searches: those conducted on detainees who are rejoining the general population of a jail after contact with the free world. In doing so, it simply confirmed the state of the law started by *Bell* in 1979, and upon which

45

all courts of appeal built in finding that strip searches of prison visitors still required reasonable suspicion.

Separately, in finding that the law was not clearly established regarding the scope of the strip search conducted here, the Magistrate Judge acknowledged that both *Powell* and *Florence* expressly limited their applicability to visual strip searches. Doc. 64 at 24–25. Yet it ignored this Court's *Evans* decision and, in a single sentence of analysis, summarily concluded that "it is not clear that the contours of the law applicable to contact searches is any more 'clearly established' than that applicable to visual searches." *Id.* at 25. But this Court's decision in *Evans* clearly establishes just that: directing an individual to spread their buttocks, then physically feeling between their buttocks, violates the Fourth Amendment absent specific suspicion that contraband is located in between the individual's buttocks. *Evans*, 407 F.3d at 1283; *cf. T.R.*, 25 F.4th at 886 (finding that generalized odor of marijuana and failure to find marijuana in student's backpack did not provide specific suspicion justifying demand that student strip naked, bend over, and spread buttocks for inspection). And given the language in both *Powell* and *Florence* expressly limiting their analysis to what is permissible for a visual strip search, the holding in *Evans* prohibiting physically invasive searches absent specific justification remains clearly established.

46

The District Court's atextual reading of *Florence* would turn that decision, which "emphasize[d] [its] limits," *Florence*, 566 U.S. at 340 (Alito, J., concurring), into a sweeping exemption from the Fourth Amendment's requirements for anyone who enters a prison. Taken to its logical conclusion, it would grant correctional officers unfettered discretion to strip search anyone, at any time, for any reason. A lawyer visiting an incarcerated client suing the officers, minor children visiting their parents, a priest ministering to a person on death row—all could be strip searched and have their breasts and genitals manipulated without any recourse. *Florence*, however, is not so broad. The unanimity of authority that developed following *Bell* and reaffirmed after *Florence* makes clear that strip searches of visitors to a prison require at least reasonable suspicion, and that strip searches cannot include physically invasive tactics. Defendants are not entitled to qualified immunity here.

### C. Defendants Were on Fair Notice of Their Unconstitutional Conduct Because of Both Case Law and Their Own Regulations—Which They Admitted in Briefing to the District Court.

Clear and longstanding precedent from across the federal circuits has unanimously recognized that the general requirement of reasonable suspicion in order to conduct a strip search applies to prison visitors—a consensus unaffected by *Bell*, *Powell*, and *Florence*. But even if such clear precedent did not exist, Defendants would still not be entitled to qualified immunity because of the

47

obviously violative nature of their conduct. "The unconstitutionality of outrageous conduct obviously will be unconstitutional." *Safford*, 557 U.S. at 377; *accord Taylor v. Riojas*, 141 S. Ct. 52, 53 (2020) (citing *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). The more egregious an official's conduct, therefore, the more likely it is that general constitutional principles will suffice to defeat qualified immunity. *See, e.g.*, *T.R.*, 25 F.4th at 883 (strip-searching a middle school girl a second time, after first strip search revealed no contraband, was obviously unconstitutional).

In determining whether an official's conduct was obviously unconstitutional, the Supreme Court has noted the relevance of administrative regulations. In *Hope v. Pelzer*, for example, the Supreme Court reversed the grant of qualified immunity to prison officials—even absent "materially similar" case law—by finding that a combination of general Eighth Amendment principles, Alabama Department of Corrections regulations, and a Department of Justice advisory would have made it obvious that prison officials could not hitch incarcerated people to outdoor posts for extended periods of time. 536 U.S. at 743–45. This Court recently reaffirmed that "regulations themselves do not constitute constitutional law, [but can] undermine any claim by defendants that they were unaware of their legal obligations." *Al-Amin v. Smith*, 511 F.3d 1317, 1336 n.37 (11th Cir. 2008).

Just as in *Hope*, Defendants were plainly on notice that strip searching Ms. Gilmore by physically manipulating her breasts and sliding a hand between her

buttocks without any suspicion violated the Fourth Amendment. First, as discussed *supra*, Section II(B)(1), precedent from both the Eleventh Circuit and others made clear that strip searches of anyone other than arrestees joining the general population of a jail require at least reasonable suspicion. *See, e.g.*, *Evans*, 407 F.3d at 1279; *T.R.*, 25 F.4th at 888. But, even outside this precedent, this is a circumstance where the Fourth Amendment's proscription of unreasonable searches, coupled with the Court's recognition that bodily autonomy implicates an individual's "most personal and deep-rooted expectations of privacy," *Winston*, 470 U.S. at 760, should have made the unconstitutionality of Defendants' conduct plain.

Just as unambiguous are GDC regulations, which provide that visitors may be strip searched only "if reasonable suspicion is found." Doc. 52-8 at 5. For other less invasive searches, such as pat downs, "[n]o reasonable suspicion is required." *Id.* Consistent with these regulations, the strip search approval form that correctional officers must complete prior to any strip search requires officers to "list the specific facts which lead [them] to believe there is reasonable suspicion that justifies the strip search[.]" Doc No. 50-8 at 10. And in conducting those strip searches, GDC regulations do not permit physical contact with the individual being searched. Doc. 52-8 at 5–6.

49

For all of these reasons, Defendants had "fair warning" that it was unlawful to strip search a visitor without reasonable suspicion—which is the touchstone for the qualified immunity analysis. *Tolan*, 572 U.S. at 656. And, to be clear, they were on actual notice of this requirement. In their briefing to the District Court, Defendants acknowledged—and themselves repeatedly argued—that GDC regulations "ha[ve] set the right standard–reasonable suspicion." Doc. 50-1 at 12; *accord id.* at 14 ("Therefore, the question is whether Defendants had 'reasonable suspicion' to perform the search."). Further, they never argued that conducting a physically abusive search by physically lifting Ms. Gilmore's breasts, examining her genitals, and swiping their hand between her buttocks would be, even potentially, constitutionally permissible.

At bottom, the combination of case law and GDC regulations leave no question that Defendants were well aware of their legal obligations—and simply ignored them in strip-searching Ms. Gilmore in an invasive and embarrassing fashion. They are therefore not entitled to qualified immunity.

## CONCLUSION

The District Court's decision flips the Fourth Amendment on its head, turning a narrow exception to the fundamental requirement of reasonable suspicion into a blanket immunity for correctional officers who strip search anyone, at any time, for any reason inside a prison. Because that determination cannot be

50

reconciled with clearly established law from this Court or the Supreme Court, the

District Court's grant of summary judgment to Defendants should be reversed.


Dated: April 12, 2023

Respectfully submitted,

*/s/ Ashok Chandran*
Janai S. Nelson
*President & Director-Counsel*
Ashok Chandran*
Arielle Humphries
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
T: (212) 965-2200
F: (212) 226-7529

Christopher Kemmitt
NAACP LEGALDEFENSE AND
EDUCATIONAL FUND, INC.
700 14th Street NW, Ste. 600
Washington, DC 20005
T: (202) 682-1300
F: (202) 682-1312

Shania King
The Law Office of Shania King, LLC
1075 Peachtree St.
Atlanta, GA 30039

*Counsel for Plaintiff- Appellant*
*\*Counsel of Record*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A), because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,107 words as counted by the word-processing system used to prepare it.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using 14-point Times New Roman font.

*/s/ Ashok Chandran*
*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF SERVICE

`I hereby certify that on April 12, 2023, I served a true and correct copy of the foregoing document via electronic notice by the CM/ECF system on all counsel or parties of record.

*/s/ Ashok Chandran*
*Counsel for Plaintiff-Appellant*