IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

No. 23-10343

CLARISSA GILMORE
Plaintiff-Appellant,

vs.

GEORGIA DEPARTMENT OF CORRECTIONS, et al.
Defendants-Appellees.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA, STATESBORO DIVISION

---

**PLAINTIFF-APPELLANT'S PETITION FOR PANEL REHEARING
AND REHEARING EN BANC**

---

Janai S. Nelson
President & Director-Counsel
Ashok Chandran*
Arielle Humphries
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
T: (212) 965-2200
F: (212) 226-7529

Christopher Kemmitt
NAACP LEGALDEFENSE AND
EDUCATIONAL FUND, INC.
700 14th Street NW, Ste. 600
Washington, DC 20005
T: (202) 682-1300
F: (202) 682-1312

Shania King
The Law Office of Shania King, LLC
1075 Peachtree St.
Atlanta, GA 30039

*Counsel for Plaintiff- Appellant*
*Counsel of Record*

## CERTIFICATE OF INTERESTED PARTIES AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, the NAACP Legal Defense and Educational Fund, Inc., and The Law Office of Shania King, LLC, state that they have no parent corporations, nor have they issued shares or debt securities to the public. These organizations are not subsidiaries of or affiliated with any publicly owned corporation, and no publicly held corporation holds ten percent of their stock. Counsel hereby further certifies that the following is a complete list of interested persons:

1. Baker, R. Stan, *District Court Judge*

2. Boyer, Matthew, *Attorney for Defendants/Appellees*

3. Carr, Christopher M., *Attorney for Defendants/Appellees*

4. Chalmers, Roger A., *Attorney for Defendants/Appellees*

5. Chandran, Ashok, *Appellate Attorney for Plaintiff/Appellant*

6. Cusimano, Angela Ellen, *Attorney for Defendants/Appellees*

7. Georgia Department of Corrections, *Defendant*

8. Gilmore, Clarissa, *Plaintiff/Appellant*

9. Humphries, Arielle, *Appellate Attorney for Plaintiff/Appellant*

10. Irizarry, Christina M., *Defendant*

11. Kemmitt, Christopher, *Appellate Attorney for Plaintiff/Appellant*

12. King, Shania, *Attorney for Plaintiff/Appellant*

ii

13.   Lupo, Sabrini Carlene, *Defendant*

14.   Milton, Alberta W., *Defendant*

15.   NAACP Legal Defense and Educational Fund, Inc., *Appellate Attorneys for Plaintiff/Appellant*

16.   Nelson, Janai S., *Appellate Attorney for Plaintiff/Appellant*

17.   Pinkston-Pope, Loretta L., *Attorney for Defendants/Appellees*

18.   Ray, Christopher L., *Magistrate Judge*

19.   Roney, Alexia, *Attorney for Defendants/Appellees*

20.   Smith, Tarmarshe A., *Defendant*

21.   Spital, Samuel, *Appellate Attorney for Plaintiff/Appellant*

22.   The Law Office of Shania King, *Attorneys for Plaintiff/Appellant*

23.   Ward, Timothy C., *Georgia Department of Corrections Commissioner*

24.   Sheets, Mulik, *Witness*

## <u>RULE 35-5(C) STATEMENT</u>

I express a belief, based on a reasoned and studied professional judgment, that the panel decision is contrary to the following decisions of the Supreme Court of the United States or the precedents of this circuit and that consideration by the full court is necessary to secure and maintain uniformity of decisions in this Court: *Wilson v. Layne*, 526 U.S. 603 (1999); *Ashcroft v. al-Kidd*, 563 U.S. 731 (2011); *District of Columbia v. Wesby*, 583 U.S. 48 (2018); *May v. City of Nahunta*, 846 F.3d 1320, 1332 (11th Cir. 2017); *Evans v. Stephens*, 407 F.3d 1272, 1281 (11th Cir. 2005).


*/s/ Ashok Chandran*
Ashok Chandran

*Attorney of Record for Plaintiff-Appellant Clarissa Gilmore*

iv

# **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PARTIES AND CORPORATE DISCLOSURE STATEMENT ................................................................ ii

RULE 35-5(C) STATEMENT................................................................ iv

TABLE OF CONTENTS........................................................................v

TABLE OF AUTHORITIES ................................................................ vi

STATEMENT OF THE ISSUES............................................................1

STATEMENT OF THE COURSE OF PROCEEDINGS ........................1

ARGUMENT ........................................................................................4

   I.    EN BANC RECONSIDERATION IS NEEDED TO CONFIRM THAT A ROBUST CONSENSUS OF PERSUASIVE AUTHORITY CAN CLEARLY ESTABLISH THE LAW. ........................................................6

      A.   *Thomas* Was Incorrect. ............................................................6

      B.   *Thomas* Has Been Abrogated By Supreme Court Precedent. ................9

      C.   *Thomas* Is Inconsistent With The Core Purpose Of Qualified Immunity....................................................................................11

      D.   The Petition Presents Issues of Exceptional Importance. .....................13

   II.   REHEARING IS ALSO WARRANTED TO HOLD IT WAS CLEARLY ESTABLISHED IN 2017 THAT "DEGRADING AND UNREASONABLE" MANUAL BODY CAVITY SEARCHES ARE UNCONSTITUTIONAL .....................................................................15

CONCLUSION ...................................................................................17

CERTIFICATE OF COMPLIANCE .....................................................18

CERTIFICATE OF SERVICE ..............................................................18

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Al-Amin v. Smith*,
   511 F.3d 1317 (11th Cir. 2008) ........................................................... 11

*Ashcroft v. Kidd*,
   563 U.S. 731 (2011) ........................................................ 9, 10, 11, 14

*Babb v. Sec'y, Dep't of Veterans' Affs.*,
   992 F.3d 1193 (11th Cir. 2021) ........................................................... 11

*Bame v. Dillard*,
   637 F.3d 380 (D.C. Cir. 2011) ........................................................... 12

*Bond v. United States*,
   529 U.S. 334 (2000) ........................................................................... 16

*Bradley v. Benton*,
   10 F.4th 1232 (11th Cir. 2021) ........................................................... 10

*Carollo v. Boria*,
   833 F.3d 1322 (11th Cir. 2016) ........................................................... 10

*City and Cnty. of S.F. v. Sheehan*,
   575 U.S. 600 (2015) ........................................................................... 10

*D.H. by Dawson v. Clayton Cnty. Sch. Dist.*,
   830 F.3d 1306 (11th Cir. 2016) ........................................................... 16

*District of Columbia v. Wesby*,
   583 U.S. 48 (2018) .......................................................... 1, 9, 11, 14

*Evans v. Stephens*,
   407 F.3d 1272 (11th Cir. 2005) ..................................................... 1, 16

*Feminist Majority Found. v. Hurley*,
   911 F.3d 674 (4th Cir. 2018) ........................................................... 12

*Files v. Toney*,
   No. 6:22-cv-542, 2023 WL 5105049 (N.D. Ala. Aug. 9, 2023) ......................14

*Garcia v. Casey*,
   75 F.4th 1176 (11th Cir. 2023) ...........................................................................11

*Glasscox v. City of Argo*,
   903 F.3d 1207 (11th Cir. 2018) ..........................................................................10

*Hope v. Pelzer*,
   536 U.S. 730 (2002) .............................................................................................17

*Irish v. Fowler*,
   979 F.3d 65 (1st Cir. 2020) .................................................................................12

*Landau v. City of Daytona Beach*,
   No. 21-12947, 2023 WL 6622208 (11th Cir. Oct. 11, 2023) ............................11

*Marsh v. Butler Cnty.*,
   268 F.3d 1014 (11th Cir. 2001) (en banc). ......................................................7, 8

*Martin v. Heckler*,
   773 F.2d 1145 (11th Cir. 1985) .....................................................................13, 14

*May v. City of Nahunta*,
   846 F.3d 1320 (11th Cir. 2017) ......................................................................1, 16

*Plumhoff v. Rickard*,
   572 U.S. 765 (2014) ...............................................................................................9

*Quinn v. Young*,
   780 F.3d 998 (10th Cir. 2015) ............................................................................12

*Robinson v. Bessemer*,
   No. 21-cv-439, 2024 WL 315005 (N.D. Ala. Jan. 26, 2024) ............................14

*Shooter v. Arizona*,
   4 F.4th 955 (9th Cir. 2021) .................................................................................12

*Shumpert v. City of Tupelo*,
   905 F.3d 310 (5th Cir. 2018) ..............................................................................12

*Simon v. City of New York*,
   893 F.3d 83 (2d Cir. 2018) ................................................................12

*Smith v. City of Troy, Ohio*,
   874 F.3d 938 (6th Cir. 2017) .............................................................12

*Starnes v. Butler Cnty. Ct. of Common Pleas, 50th Jud. Dist.*,
   971 F.3d 416 (3d Cir. 2020) ..............................................................12

*Terrell v. Smith*,
   668 F.3d 1244 (11th Cir. 2012) .........................................................11

*Thomas ex rel. Thomas v. Roberts*,
   323 F.3d 950 (11th Cir. 2003) ............................... 3, 4, 6, 8, 9, 10, 11, 12, 13, 14

*Werner v. Wall*,
   836 F.3d 751 (7th Cir. 2016) .............................................................12

*Wilson v. Layne*,
   526 U.S. 603 (1999)...............................................................4, 6, 7, 8

*Winston v. Lee*,
   470 U.S. 753 (1985)....................................................................16

*Z.J. by & through Jones v. Kansas City Bd. of Police Comm'rs*,
   931 F.3d 672 (8th Cir. 2019) ............................................................12

## Other Authorities

11th Cir. L.R. 35-3 ........................................................................13

## STATEMENT OF THE ISSUES

1.    Whether the panel's reliance on Eleventh Circuit precedent that "we do not look to persuasive authority—even a 'robust consensus' of it—to determine whether the law was 'clearly established,'" Panel Op. 30, contradicts the Supreme Court's repeated holdings that "[t]o be clearly established, a legal principle must be . . . dictated by 'controlling authority' *or 'a robust consensus of cases of persuasive authority.*'" *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (emphasis added).

2.    Whether the panel erred by granting qualified immunity, without analysis, for a "degrading and unreasonable" strip search involving a manual cavity search, Panel Op. 23, notwithstanding this Court's unequivocal holdings that "degrading and forceful" strip searches, including manual cavity searches, violate the Fourth Amendment. *See May v. City of Nahunta*, 846 F.3d 1320, 1332 (11th Cir. 2017); *Evans v. Stephens*, 407 F.3d 1272, 1283 (11th Cir. 2005).

## STATEMENT OF THE COURSE OF PROCEEDINGS

Clarissa Gilmore visited her then-husband at Smith State Prison on February 26, 2017. Panel Op. 4. After clearing three separate security screenings with at least four different officers, Gilmore proceeded to a visitation room that was under the supervision of Officer Sabrini Lupo and Lieutenant Alberta Milton. *Id.* 4–5. About thirty minutes into the visit, Milton left and brought Officer Christina

Irizarry back, then asked Gilmore to leave the room with them. *Id.* 5. Milton asked Gilmore to consent to a strip search but did not explain the basis for the search. *Id.* When Gilmore protested, Milton informed her that she would be arrested and strip searched anyway if she withheld consent. *Id.* Gilmore signed the consent form. *Id.*

Milton then ordered Gilmore to remove her clothing and underwear. *Id.* Irizarry manually searched Gilmore, lifting her breasts. *Id.* 6. Milton then ordered Gilmore to turn around, bend over, and spread her buttocks. *Id.* Gilmore complied, and Irizarry felt between her buttocks with a gloved hand. Milton and Irizarry then ordered Gilmore to spread her vagina, which they visually inspected. *Id.* After the fact, Lupo, Milton, and Irizarry provided inconsistent explanations for the strip search. *Id.* 6–7.

Gilmore filed suit. At the close of discovery, the officers sought summary judgment. They agreed that the Fourth Amendment required at least reasonable suspicion for a strip search and asserted that they had such suspicion. Doc. 50-1 at 12, 14–15, 18–20. On referral, a magistrate judge recommended granting the officers qualified immunity because it was not clearly established that they needed reasonable suspicion to conduct such a search—an argument not advanced by the officers. Doc. 64 at 13–22. The magistrate judge did not separately analyze whether the search was excessive in scope. The District Court adopted the

2

recommendation, also failing to separately consider whether the scope of the search violated the Fourth Amendment.

Gilmore appealed, raising two arguments relevant to this petition. First, she argued that case law clearly established that at least reasonable suspicion was needed before a prison visitor could be strip searched. She cited numerous cases from this Court involving strip searches of civilians and pointed to the unanimous consensus of other circuits holding that at least reasonable suspicion is required before a prison visitor may be strip searched. Second, Gilmore argued that clear law from this Court and the Supreme Court established that physically invasive cavity searches are excessive in scope.

A panel of this Court affirmed the grant of qualified immunity to the officers. In rejecting Gilmore's first argument, the panel found that under the earliest-case rule, this Court's decision in *Thomas ex rel. Thomas v. Roberts*, 323 F.3d 950 (11th Cir. 2003), required it to ignore the unanimous consensus of other circuits. Two judges concurred separately. Judge Rosenbaum noted that the rule announced in *Thomas* "rested on a faulty premise" and amounted to "opt[ing] out of Supreme Court precedent." Rosenbaum Conc. 3, 5. Judge Newsom "share[d] Judge Rosenbaum's concern that [*Thomas*] may well be out of step with the Supreme Court's view about the role of non-binding authority in the qualified-immunity calculus." Newsom Conc. 4.

The panel did not address Gilmore's second argument in holding that the officers were entitled to qualified immunity. It agreed that the officers conducted a search that was abusive and excessive in scope, and that such scope was an "independent reason" to find a Fourth Amendment violation, Panel Op. 22, but did not analyze whether that right was clearly established.

## **ARGUMENT**

For three reasons, this Court should grant the petition and reconsider *Thomas*'s categorical rejection of out-of-circuit authority when assessing qualified immunity. First, *Thomas* was wrong when it was decided. The plain language of the Supreme Court's decision in *Wilson v. Layne*, 526 U.S. 603 (1999), made clear that out-of-circuit authority plays a role in the qualified immunity calculus; *Thomas* simply "declined to recognize it." Rosenbaum Conc. 2. Second, in the twenty years since *Thomas*, the Supreme Court has repeatedly reaffirmed that a robust consensus of cases of persuasive authority can clearly establish the law. Third, *Thomas*'s approach to qualified immunity—protecting officials who ignore every other court in the country that has held their conduct illegal—is incompatible with the touchstone inquiry of fair notice. *Every single other circuit* has understood the Supreme Court's jurisprudence—from *Wilson* through the present—to make clear that a robust consensus of persuasive authority from other circuits can clearly establish the law. The problems created by *Thomas* are of exceptional importance;

4

for nearly a quarter-century, this Court has been "out of step with the Supreme Court's" directions about qualified immunity. Newsom Conc. 4. Worse still, this Court's "case law on this issue is inconsistent." Rosenbaum Conc. 4. Some opinions have recognized the robust consensus standard, while others have rejected it; en banc review is needed to conform this Court's approach to that of the Supreme Court and of every other circuit.

Rehearing is also needed to analyze whether Gilmore's right to be free from a "degrading and unreasonable" manual body-cavity search was clearly established in 2017. The officers manipulated Gilmore's naked body and inserted a hand between her buttocks—all for no apparent reason other than malice, and without consideration of any less intrusive alternatives. As the panel recognized, the abusive manner of the search was an "independent reason" why Gilmore's Fourth Amendment rights were violated beyond the lack of reasonable suspicion for the search. Panel Op. 22. Yet it affirmed the grant of qualified immunity without explaining how a reasonable officer could think that a "degrading and unreasonable" cavity search was constitutional in light of this Court's repeated pronouncements to the contrary.

## I.     EN BANC RECONSIDERATION IS NEEDED TO CONFIRM THAT A ROBUST CONSENSUS OF PERSUASIVE AUTHORITY CAN CLEARLY ESTABLISH THE LAW

In *Wilson*, the Supreme Court held that officers were entitled to qualified immunity because "[p]etitioners have not brought to our attention any cases of controlling authority in their jurisdiction at the time of the incident which clearly established the rule on which they seek to rely, nor have they identified a consensus of cases of persuasive authority . . . ." 526 U.S. at 617. Nonetheless, in *Thomas*, this Court held that "we do not understand *Wilson* to have held that a consensus of cases of persuasive authority would be able to establish law clearly." 323 F.3d at 955.

*Thomas* was wrong when decided and has only fared worse in the intervening twenty years. *Wilson* specifically referenced "a consensus of cases of persuasive authority" as a basis for overcoming qualified immunity, and since 2011, the Supreme Court has unequivocally held that a robust consensus of persuasive authority *can* clearly establish the law. Moreover, *Thomas* ignores the core inquiry of qualified immunity: whether officials have fair notice—from all relevant law—that their conduct violates the Constitution.

### A.     *Thomas* Was Incorrect.

This Court should revisit *Thomas*; "[f]rom its inception, *Thomas* rested on a faulty premise." Rosenbaum Conc. 3.

The Supreme Court first referenced the role of persuasive authority in the qualified immunity calculus in *Wilson*, granting officers qualified immunity because "[p]etitioners have not brought to our attention any cases of controlling authority in their jurisdiction at the time of the incident which clearly established the rule on which they seek to rely, *nor have they identified a consensus of cases of persuasive authority* . . . ." 526 U.S. at 617 (emphasis added). The Court's decision to separate out "a consensus of cases of persuasive authority" from "controlling authority in their jurisdiction" can only be read to permit reliance on authority from outside the jurisdiction. And indeed, the *Wilson* Court went on to analyze law from other jurisdictions, finding that a single opinion from another circuit was insufficient. *Id.* at 616–17. The Court then cited a circuit split that had developed between the four circuits that had addressed the question as a further reason to grant the officers immunity. *Id.* at 618. Based on this analysis, "[t]here is no way to reasonably read *Wilson* as not acknowledging that a consensus of cases of persuasive authority can clearly establish the law for qualified-immunity purposes." Rosenbaum Conc. 3 (cleaned up).

*Thomas*'s erroneous reading of *Wilson* stemmed from its reliance on dicta from *Marsh v. Butler County*, an appeal in which neither party raised the issue of whether and how out-of-circuit authority factored into the analysis of clearly established law. 268 F.3d 1014 (11th Cir. 2001) (en banc). In *Marsh*, the plaintiffs

7

never argued that they could defeat qualified immunity by showing a robust consensus of persuasive authority, instead focusing their arguments on this Court's precedents. *See* En Banc Br. of Appellants, *Marsh v. Butler Cnty.*, No. 99-12813-B, 2001 WL 34121387, at *36–*37, *41–*42 (11th Cir. Jan. 9, 2001); En Banc Reply Br. of Appellants, *Marsh*, No. 99-12813-B, 2001 WL 34121386, at *14–*15 (11th Cir. Jan. 25, 2001). As a result, the defendants did not make any arguments about—or even cite—*Wilson* in their briefing. *See generally* En Banc Br. of Appellees, *Marsh*, No. 99-12813-B, 2001 WL 34121388 (11th Cir. Jan. 19, 2001). Nevertheless, this Court stated in a footnote that "[w]e do not understand [*Wilson*] to have held that a 'consensus of cases of persuasive authority' from other courts would be able to establish the law clearly." *Marsh*, 268 F.3d at 1032 n.10.

*Thomas* erred by treating *Marsh* as controlling authority on whether out-of-circuit authority can clearly establish the law for purposes of qualified immunity. *Thomas* conducted no independent analysis of *Wilson*, instead simply citing *Marsh* to hold that "Plaintiffs' argument based upon decisions in other circuits is foreclosed by our precedent." 323 F.3d at 955. But *Marsh*'s unreasoned dicta provided no basis to "ignore *Wilson*'s plain language" to the contrary. Rosenbaum Conc. 3.

**B.**    ***Thomas* Has Been Abrogated By Supreme Court Precedent.**

Whatever merit the *Thomas* rule had in 2003, the Supreme Court quickly rejected it, explicitly holding that, even "absent controlling authority," qualified immunity may be defeated by "a robust 'consensus of cases of persuasive authority.'" *Ashcroft*, 563 U.S. at 742. The Court in *Ashcroft* further explained that a single district court opinion from another circuit was clearly insufficient to demonstrate such a "robust consensus" of persuasive authority. *Id.* at 741–42. As Judge Rosenbaum noted, this analysis "would make little sense if such a consensus could not 'clearly establish' relevant law." Rosenbaum Conc. 3.

Nor was *Ashcroft* an isolated directive from the Supreme Court. In *Wesby*, the Court unambiguously reiterated: "To be clearly established, a legal principle must . . . [be] dictated by controlling authority *or a robust consensus of cases of persuasive authority* . . . ." 583 U.S. at 63 (emphasis added) (internal citations omitted). Once again, in granting the defendants qualified immunity, the Court looked specifically to precedent from various courts of appeal to determine whether a "robust consensus" existed. *Id.* at 67 & n.10 (citing precedent from the Eighth, First, Eleventh, and Sixth Circuits). In several other cases considering qualified immunity, the Supreme Court has conducted this same analysis. *See, e.g.*, *Plumhoff v. Rickard*, 572 U.S. 765, 780–81 (2014) (finding law not clearly established in Sixth Circuit where this Court had reached a contrary result and no

9

other circuits had addressed the question); *City and Cnty. of S.F. v. Sheehan*, 575 U.S. 600, 617 (2015) (finding that law was not clearly established in Ninth Circuit because of varying approaches of Fourth, Eighth, and Eleventh Circuits).

The Supreme Court has repeatedly and explicitly approved what *Thomas* rejected: law can be clearly established by a robust consensus of persuasive authority. Yet because this Court has not yet explicitly overruled *Thomas*, it continues to sow confusion between panels. Some panels have continued to rely on *Thomas* and limit their consideration of clearly established law to the Supreme Court, this Court, or the relevant state supreme court. *See, e.g.*, *Bradley v. Benton*, 10 F.4th 1232, 1242–43 (11th Cir. 2021). Other panels have correctly recognized the "robust consensus" standard. *See, e.g.*, *Glasscox v. City of Argo*, 903 F.3d 1207, 1217 (11th Cir. 2018); *Carollo v. Boria*, 833 F.3d 1322, 1333 (11th Cir. 2016).[1] This Court even conducted the robust consensus analysis in one unpublished opinion, finding that a single out-of-circuit opinion was insufficient to

---

[1] The panel acknowledged both the Supreme Court's clear language and this Court's references to the "robust consensus" standard, yet still held that persuasive authority was not part of the qualified immunity calculus because "in neither *Carollo* nor *Glasscox* did [the Court] actually consult persuasive authority when reaching our holding." Panel Op. 29. But the "robust consensus" standard is only "necessary *absent controlling authority* . . . ." *Ashcroft*, 563 U.S. at 742 (emphasis added). In both *Carollo* and *Glasscox*, the "robust consensus" test was not employed because controlling Eleventh Circuit precedent dictated the result. *Carollo*, 883 F.3d at 1334; *Glasscox*, 903 F.3d at 1218–19. The lack of a need to consult out-of-circuit authority is not a prohibition on doing so.

clearly establish law. *Landau v. City of Daytona Beach*, No. 21-12947, 2023 WL 6622208, at *8 n.8 (11th Cir. Oct. 11, 2023).

In sum, there is no way to read *Ashcroft* and *Wesby* as permitting the categorical rejection of persuasive authority that *Thomas* established. Yet the confusion over *Thomas*'s continued vitality has led panels of this Court to "opt out of Supreme Court precedent." Rosenbaum Conc. 5. This Court's full review is needed to conform future panels with the Supreme Court. *Babb v. Sec'y, Dep't of Veterans' Affs.*, 992 F.3d 1193, 1201 (11th Cir. 2021) ("[O]ur duty to vertical precedent trumps our duty to horizontal precedent.").

### C.    *Thomas* Is Inconsistent With The Core Purpose Of Qualified Immunity.

*Thomas*'s legal infirmities are only compounded by its fundamental inconsistency with the purpose of qualified immunity. "At its core, the question is one of fair notice[.]" *Terrell v. Smith*, 668 F.3d 1244, 1255 (11th Cir. 2012); *accord* Newsom Conc. 4 ("[M]odern qualified-immunity doctrine bottoms on notions of 'fair notice' to government officials."). For this reason, courts can consider *any* clear source of law—including statutes, *see Garcia v. Casey*, 75 F.4th 1176, 1187 (11th Cir. 2023), and regulations, *Al-Amin v. Smith*, 511 F.3d 1317, 1336 n.37 (11th Cir. 2008). Rather than formalism, "real-world 'fair notice' is qualified-immunity's lodestar . . . ." Newsom Conc. 5. In a situation like this, where "all nine of [the other] circuits that have considered the issue have held that

11

the Fourth Amendment requires reasonable suspicion for strip searches of prison visitors," *id.* 6, qualified immunity is no defense.

All other circuits have recognized that public officials may not ignore unanimously agreed-upon law solely because the precise conduct has not been addressed in their specific jurisdiction. *Irish v. Fowler*, 979 F.3d 65, 76 (1st Cir. 2020) ("[S]ister circuit law is sufficient to clearly establish a proposition of law. . . ."); *Simon v. City of New York*, 893 F.3d 83, 92 (2d Cir. 2018) (same); *Starnes v. Butler Cnty. Ct. of Common Pleas, 50th Jud. Dist.*, 971 F.3d 416, 428 (3d Cir. 2020) (same); *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 705 (4th Cir. 2018) (same); *Shumpert v. City of Tupelo*, 905 F.3d 310, 320 (5th Cir. 2018), as revised (Sept. 25, 2018) (same); *Smith v. City of Troy, Ohio*, 874 F.3d 938, 944 (6th Cir. 2017) (same); *Werner v. Wall*, 836 F.3d 751, 762–63 (7th Cir. 2016) (same); *Z.J. by & through Jones v. Kansas City Bd. of Police Comm'rs*, 931 F.3d 672, 684 (8th Cir. 2019) (same); *Shooter v. Arizona*, 4 F.4th 955, 963 (9th Cir. 2021) (same); *Quinn v. Young*, 780 F.3d 998, 1005 (10th Cir. 2015) (same); *Bame v. Dillard*, 637 F.3d 380, 384 (D.C. Cir. 2011), as amended (Mar. 29, 2011) (same). *Thomas* sets this Court apart as the only one to permit willful blindness by officials.

12

**D.    The Petition Presents Issues of Exceptional Importance.**

En banc review is appropriate because the panel opinion's adherence to *Thomas* has created three distinct layers of inconsistency: with the Supreme Court, with every other federal circuit, and between different panels of this Court.

This Court's local rules recognize that en banc review is appropriate "to bring to the attention of the entire court a panel opinion that is allegedly in direct conflict with precedent of the Supreme Court . . . ." 11th Cir. L.R. 35-3. The panel opinion's adherence to *Thomas* ignores that the Supreme Court has subsequently explicitly endorsed the very idea *Thomas* rejected: that a consensus of persuasive authority can clearly establish law. *See supra*, Section I(A).

Continuing to rely on *Thomas* creates disunity amongst the federal courts of appeal. As noted above, every single other circuit has recognized the plain meaning of the Supreme Court's qualified immunity jurisprudence and permitted consideration of out-of-circuit authority to assess whether law is clearly established. *See supra*, Section I(C). *Thomas* thus violates this Court's admonition that "[t]o the extent that circuits can maintain uniformity with principled decisions, there is desirable predictability of the law and equal application throughout the country." *Martin v. Heckler*, 773 F.2d 1145, 1153 (11th Cir. 1985).

Moreover, the clear conflict between *Thomas* and the Supreme Court has caused "confusion on this point" and led panels of this Court "to say things that are

13

just downright wrong." Rosenbaum Conc. 4 (citing examples). As Judge

Rosenbaum noted, panels of this Court have attempted to square *Thomas* with the

fundamentally incompatible contrary directives in *Ashcroft* and *Wesby*, suggesting

that a plaintiff must show a "robust consensus" of Eleventh Circuit authority. *Id.*

     *Thomas* continues to be cited in numerous opinions today, and its erroneous

rejection of Supreme Court precedent continues to foreclose valid civil rights

claims of all kinds in this Circuit. *See, e.g.*, *Robinson v. Bessemer*, No. 21-cv-439,

2024 WL 315005, at *11 (N.D. Ala. Jan. 26, 2024) (applying *Thomas* and granting

qualified immunity on excessive force claim); *Files v. Toney*, No. 6:22-cv-542,

2023 WL 5105049, at *7 (N.D. Ala. Aug. 9, 2023) (same for deliberate

indifference claim). This Court should intervene to prevent otherwise-meritorious

civil rights claims from being dismissed in violation of Supreme Court precedent.

     Gilmore's case highlights the real-world consequences of *Thomas*'s errors.

Her claim implicates one of the most fundamental rights protected by the Fourth

Amendment. As the panel found, the officers' conduct egregiously violated that

right by strip searching her with *no* articulable suspicion. And a uniform consensus

of nine other circuits has determined that the officers' precise conduct is unlawful.

Yet because of *Thomas*, those officers will not face any accountability for their

conduct. This petition presents the ideal vehicle to revisit *Thomas*; the officers

agreed at oral argument that they "were wagering everything on [*Thomas*'s]

proposition that clearly established law can come only from the Supreme Court, or from [this Court], or in this case, from the Georgia Supreme Court." Oral Arg. Recording at 19:36–19:50 (Apr. 17, 2024), available at https://www.ca11.uscourts.gov/sites/default/files/oral_argument_recordings/23-10343_04172024.mp.

## II.    REHEARING IS ALSO WARRANTED TO HOLD IT WAS CLEARLY ESTABLISHED IN 2017 THAT "DEGRADING AND UNREASONABLE" MANUAL BODY CAVITY SEARCHES ARE UNCONSTITUTIONAL

Rehearing is also appropriate to address whether Gilmore's right to be free from a "degrading and unreasonable" strip search was clearly established. The panel opinion correctly determined that the strip search was abusive because: (1) it involved a cavity search; (2) it involved significant physical intrusions into Gilmore's body; and (3) less invasive alternatives were readily available. Panel Op. 22–24. And the panel opinion acknowledged that this excessive scope was an "independent reason" to hold the strip search unlawful. *Id.* 22. Yet the panel did not separately analyze whether the unconstitutional scope of the search was clearly established in 2017. *See* Panel Op. 24–30. That error warrants correction; even if the officers were entitled to qualified immunity for unconstitutionally initiating a strip search, they were not automatically entitled to qualified immunity for the unconstitutional scope of that search.

15

Even strip searches that are constitutional at inception can become unconstitutional if they become excessive in scope. *D.H. by Dawson v. Clayton Cnty. Sch. Dist.*, 830 F.3d 1306, 1317 (11th Cir. 2016). The Supreme Court has long held that physical intrusion onto a person's body implicates the "most personal and deep-rooted expectations of privacy." *Winston v. Lee*, 470 U.S. 753, 760 (1985). Put differently, "[p]hysically invasive inspection is simply more intrusive than purely visual inspection." *Bond v. United States*, 529 U.S. 334, 337 (2000). Recognizing as much, this Court held a physically invasive strip search—in which an officer felt between an arrestee's buttocks—violated the Fourth Amendment. *Evans*, 407 F.3d at 1281. This Court has relied on *Evans* to hold that a *visual* strip search was clearly unconstitutional where conducted in a "degrading and forceful manner." *May*, 846 F.3d at 1332. The panel's finding that the strip search was conducted in a "degrading and unreasonable manner," Panel Op. 23—involving some of the exact same physical invasion of body cavities held unconstitutional in *Evans*—thus rendered the officer ineligible for qualified immunity.

Additionally, as the panel opinion noted, the abusive strip search here violated state regulations proscribing "[b]ody cavity and invasive searches." Panel Op. 23 (alteration in original). The panel described the violation of those regulations as "certainly relevant evidence" of a constitutional violation, citing

*Hope v. Pelzer*, 536 U.S. 730, 743–45 (2002). *Id.* But, as the cited portion of *Hope* makes clear, unambiguous regulations are also relevant to whether the violation of law was clearly established. *Hope*, 536 U.S. at 743–44 (discussing state regulations as relevant to whether officers had "fair warning" that they "violated clearly established law"). Taken together, this Court's precedents and state regulations "provide[] . . . strong support for the conclusion that [the officers] were fully aware of the wrongful character of their conduct," and the Fourth Amendment excessive scope violation was clearly established. *Id.* at 744.

## CONCLUSION

This Court should grant the petition for rehearing.

Dated: August 26, 2024

Respectfully submitted,

*/s/ Ashok Chandran*
Janai S. Nelson
*President & Director-Counsel*
Ashok Chandran*
Arielle Humphries
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
T: (212) 965-2200
F: (212) 226-7529

Christopher Kemmitt
NAACP LEGALDEFENSE AND
EDUCATIONAL FUND, INC.
700 14th Street NW, Ste. 600
Washington, DC 20005
T: (202) 682-1300
F: (202) 682-1312

Shania King
The Law Office of Shania King, LLC
1075 Peachtree St.
Atlanta, GA 30039

*Counsel for Plaintiff-Appellant*
*Counsel of Record*

17

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitations of Fed. R. App. P. 35(b)(2)(A) and 11th Cir. L.R. 35-1, because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and 11th Cir. L.R. 35-1, this document contains 3803 words as counted by the word-processing system used to prepare it.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using 14-point Times New Roman font.

*/s/ Ashok Chandran*
*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that on August 26, 2024, I served a true and correct copy of the foregoing document via electronic notice by the CM/ECF system on all counsel or parties of record.

*/s/ Ashok Chandran*
*Counsel for Plaintiff-Appellant*

[PUBLISH]

# In the
# United States Court of Appeals
## For the Eleventh Circuit

_____

No. 23-10343

_____

CLARISSA GILMORE,

Plaintiff-Appellant,

*versus*

GEORGIA DEPARTMENT OF CORRECTIONS,
an agency of the State of Georgia,
COMMISSIONER, GEORGIA DEPARTMENT OF
CORRECTIONS,
in his official capacity,
ALBERTA W. MILTON,
individually and in her official capacity,
SABRINI CARLENE LUPO,
individually and in her official capacity,
SMITH SP WARDEN,
in his official capacity as successor-in-interest,

2                    Opinion of the Court                    23-10343

et al.,

                                                    Defendants-Appellees,

DOUGLAS M. WILLIAMS,
individually and in his official capacity,

                                                                Defendant.

                        ————————————

                Appeal from the United States District Court
                    for the Southern District of Georgia
                    D.C. Docket No. 6:18-cv-00115-RSB-CLR

                        ————————————

Before ROSENBAUM, NEWSOM, and TJOFLAT, Circuit Judges.

ROSENBAUM, Circuit Judge:

        "There can be no doubt that a strip search is an invasion of
personal rights of the first magnitude." *Chapman v. Nichols*, 989 F.2d
393, 395 (10th Cir. 1993).  Indeed, the Seventh Circuit has described
strip searches that involve inspection of the anal and genital areas
as "demeaning, dehumanizing, undignified, humiliating, terrifying,
unpleasant, embarrassing, repulsive, signifying degradation and
submission."  *Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1272
(7th Cir. 1983) (citation and internal quotation marks omitted).

And the Tenth and Eighth Circuits have recognized that a "strip search, regardless how professionally and courteously conducted, is an embarrassing and humiliating experience." *Boren v. Deland*, 958 F.2d 987, 988 n.1 (10th Cir. 1992) (quoting *Hunter v. Auger*, 672 F.2d 668, 674 (8th Cir. 1982). So it's not surprising that the Supreme Court has said that this type of search "instinctively gives us the most pause." *Bell v. Wolfish*, 441 U.S. 520, 558 (1979).

This case involves a strip search of a civilian visiting a prison. When Plaintiff-Appellant Clarissa Gilmore was visiting her incarcerated husband, officers strip-searched her, leaving her "completely and utterly humiliated." During the search, an officer manipulated Gilmore's breasts, ordered her to "bend over," and "felt in between" her buttocks with a gloved hand. The officers did not inform Gilmore of the reasons for the search, and the search revealed no contraband.

Gilmore sued, claiming that the officers violated her Fourth Amendment right to be free from unreasonable searches and seizures. *See* U.S. Const. amend. IV. The district court granted summary judgment to the officers. In doing so, it found that the search did not violate clearly established law, so the officers were entitled to qualified immunity. We conclude that the officers' strip search violated Gilmore's constitutional rights. But a line of Supreme Court precedent authorizes blanket strip searches of prisoners for security reasons, and no Supreme Court or Eleventh Circuit precedent expressly prohibits blanket searches of prison visitors. And while our sister circuits have uniformly rejected suspicionless strip

searches of prison visitors, our precedent precludes us from considering that precedent in the "clearly established" inquiry. So we must agree with the district court that the law was not "clearly established" when Gilmore's strip search occurred. Therefore, after careful consideration, and with the benefit of oral argument, we affirm the district court's grant of summary judgment.

## I.      BACKGROUND

### A. Factual Background[1]

Gilmore's then-husband was incarcerated at Smith State Prison in Glenville, Georgia. Gilmore visited him twice a month. On February 26, 2017, Gilmore arrived at the prison, as she had roughly fifty times before, and proceeded through the security screening. That meant going through three types of searches: a pat-down search, a metal-detector wand, and an electromagnetic-radiation body scan. During the security screening, Gilmore encountered at least four officers.

After Gilmore cleared the security screening, correctional officers escorted her to a second building, which contained the visitation room. Officer Sabrini Lupo assigned Gilmore to a visitation table, where her husband joined her, and their visit began. Officer

---

[1] Because we review an order granting summary judgment against Gilmore, we recount the facts in the light most favorable to her. *See Marbury v. Warden*, 936 F.3d 1227, 1232 (11th Cir. 2019). Many of the facts are contested.

Lupo and Lieutenant Milton remained present in the visitation room during the visit.

About thirty minutes into the visit, Gilmore noticed that Lieutenant Milton was staring at her. Gilmore stared back for "one to two minutes." In apparent response, Lieutenant Milton walked past Gilmore and returned to the front of the room, where she spoke to the other officers. Then, Lieutenant Milton left the visitation room to get Officer Christina Irizarry. When Lieutenant Milton returned, she told Gilmore to go with her.

Lieutenant Milton and Officer Irizarry took Gilmore into an empty bathroom and handed her a strip-search approval form. That form was blank and lacked approval signatures from prison officials. Gilmore asked why the officers were going to search her, but Lieutenant Milton refused to tell her. Gilmore also asked if she could speak with Lieutenant Milton's supervisor, but Lieutenant Milton responded that she was the officer in charge that day.

The officers insisted that Gilmore sign the strip-search approval form. If she didn't, they said, Gilmore would be sent to jail and would be unable to visit her husband at the prison again. Not only that, Lieutenant Milton told her, the officers would "search [her] anyway." Gilmore "didn't feel like [she] had an option," so she signed the form.

After Gilmore signed the form, Lieutenant Milton instructed her to remove her clothes, including her bra and underwear. Gilmore complied. Officer Irizarry examined Gilmore's clothing for

contraband but found nothing.  When Officer Irizarry finished, at Lieutenant Milton's direction, she manually searched Gilmore.

Officer Irizarry manipulated Gilmore's breasts, lifting each breast and looking underneath it.  Lieutenant Milton then ordered Gilmore to "[t]urn around," "bend over," and "open [her] butt cheeks."  Gilmore did so, and Officer Irizarry "felt in between" Gilmore's buttocks with her gloved hand.  The officers also instructed Gilmore to spread her vagina, which they visually inspected.  Finding no contraband, the officers told Gilmore to put her clothes back on and permitted her to resume her visit.

Officer Irizarry led Gilmore back to the visitation room and told Gilmore that she was "so sorry."  Although Gilmore stayed until visitation ended, she and her husband were upset and "tearing up," and they barely spoke.  Gilmore left the prison and cried through the drive home.

Two days later, Gilmore called Deputy Warden Tamarshe Smith to complain and ask why she had been searched.  Deputy Warden Smith seemed unaware of the incident.  He told Gilmore that he would look into it and call her back.  A few days later, Gilmore spoke to Deputy Warden Smith again.  During this second call, Deputy Warden Smith apologized and "said that he did not see anything on the video" footage of the visitation room "that would warrant a strip search."  Deputy Warden Smith denies that this second call occurred.

At her deposition, Officer Lupo claimed that during Gilmore's visit to the prison, Officer Lupo smelled marijuana on

Gilmore and shared her observation with Lieutenant Milton.  Officer Lupo also testified that she found it suspicious that Gilmore was staring at her and Lieutenant Milton.  But Lieutenant Milton and Officer Irizarry's witness statements, which they made the same day as the incident, did not mention any marijuana odor or suspicious eye contact.  Nor did the strip-search approval form, which stated only that Gilmore was "[u]nder suspicion for carrying contraband."  And Gilmore denies consuming, possessing, or smelling like marijuana at any point before or during her visit.  Gilmore also denies staring at Officer Lupo during her visit.

As for Lieutenant Milton, she testified that she called Defendant Deputy Smith before conducting the search, and Smith gave her verbal approval.[2]  But Lieutenant Milton's contemporaneously sworn statement contains no reference to any such call.  And duty records show that Deputy Warden Smith was not working that day.

### B.  Procedural History

Gilmore sued the Georgia Department of Corrections, Commissioner Douglas Williams, Lieutenant Milton, Officer Lupo, Officer Irizarry, and Deputy Warden Smith under 42 U.S.C.

---

[2] The Georgia Department of Corrections' regulations provide that, "No strip search shall be conducted until the Strip Search Approval Form . . . is signed by one of the following designees: . . . Warden or Deputy Warden . . . Administrative Duty Officer or the Officer in Charge with verbal approval of the Administrative Duty Officer."

§ 1983, claiming that they violated her Fourth Amendment right to be free from unreasonable searches and seizures.  That included a failure-to-intervene claim against Officer Lupo, Deputy Warden Smith, and Commissioner Williams.  Gilmore also alleged several state-law claims, none of which are relevant to this appeal, so we discuss them no further.

Defendants moved to dismiss all claims except the Fourth Amendment claim, and the district court granted that motion.  The district court also dismissed Gilmore's failure-to-intervene claim against Officer Lupo and Deputy Warden Smith.

After discovery, Defendants moved for summary judgment.  The magistrate judge requested supplemental briefing on whether the individual Defendants were acting within the scope of their discretionary authority when they performed the strip search.  Although Defendants filed a responsive brief, Gilmore did not.

The magistrate judge issued a report and recommendation ("R&R") recommending that the district court grant Defendants' summary-judgment motion.  The R&R concluded that Defendants acted within the scope of their discretionary authority, and it was not "clearly established" that reasonable suspicion (or any suspicion) was required for a strip search of a prison visitor.  As for Gilmore's supervisory-liability claim against Deputy Warden Smith, the magistrate judge recommended summary judgment in his favor.

Gilmore objected to the R&R.  She argued that case law clearly established that suspicionless searches of prison visitors

violated the Fourth Amendment and that the strip search exceeded constitutional limits.  But Gilmore did not challenge the R&R's finding that the individual Defendants acted within the scope of their discretionary authority.

The district court adopted the R&R and granted summary judgment to Defendants.  Like the magistrate judge, it found that the individual Defendants acted within the scope of their discretionary authority and did not violate clearly established law.

Gilmore timely appealed.  On appeal, Gilmore does not challenge the grant of summary judgment on her supervisory-liability claim against Deputy Warden Smith.  Rather, she asserts that the district court erred in granting summary judgment to the other individual Defendants on qualified-immunity grounds for two reasons: (1) because Defendants did not act within the scope of their discretionary authority, and (2) because clearly established law required reasonable suspicion for the search.

## II.    STANDARD OF REVIEW

We review a grant of summary judgment de novo, construing all evidence in the light most favorable to the non-moving party. *Marbury v. Warden*, 936 F.3d 1227, 1232 (11th Cir. 2019).  For summary-judgment motions based on qualified immunity, "we are required to resolve all issues of material fact in favor of the plaintiff." *Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002).

## III.    DISCUSSION

Summary judgment is appropriate when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  An issue is genuine if a reasonable trier of fact could return judgment for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And a fact is material if it "might affect the outcome of the suit under the governing law" and is not "irrelevant or unnecessary."  *Id.*

Here, the district court granted summary judgment on Gilmore's Fourth Amendment claim.  In doing so, it found that the individual Defendants were entitled to qualified immunity.

Qualified immunity shields officers from civil liability so long "as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Carruth v. Bentley*, 942 F.3d 1047, 1053 (11th Cir. 2019) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  The "central idea" of qualified immunity "is this pragmatic one: officials can act without fear of harassing litigation only when they can reasonably anticipate—*before* they act or do not act—if their conduct will give rise to damage for liability for them."  *Maddox v. Stephens*, 727 F.3d 1109, 1120 (11th Cir. 2013) (quoting *Foy v. Holston*, 94 F.3d 1528, 1534 (11th Cir. 1996)).

To be entitled to qualified immunity, Defendants must show that they acted "within the scope of [their] discretionary authority" when they strip-searched Gilmore.  *See Mikko v. City of Atlanta*, 857 F.3d 1136, 1143–44 (11th Cir. 2017) (citation and internal quotation

marks omitted).  If Defendants make that showing, the burden shifts to Gilmore to prove that (1) Defendants' conduct violated a constitutional right; and (2) that right was "clearly established" at the time.  *See Alcocer v. Mills*, 906 F.3d 944, 951 (11th Cir. 2018).  And each defendant must receive "an individualized analysis of whether [she] is entitled to qualified immunity."  *Id*. at 952.

Following the criteria for qualified immunity, our analysis proceeds in three parts.  First, we explain that Gilmore abandoned any challenge to Defendants' discretionary-authority showing by failing to object to that portion of the R&R.  Second, we determine that Defendants' strip search violated Gilmore's constitutional rights.  Third, we conclude that Defendants did not violate clearly established law, so they are entitled to qualified immunity.

## A.  *Gilmore abandoned any challenge to the district court's discretionary-authority determination.*

An officer acted within the scope of her discretionary authority if she "was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within [her] power to utilize."  *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004).  Where, as here, the plaintiff alleges that the officer's conduct was unlawful, we do not merely determine "whether it was within the defendant's authority to commit the allegedly illegal act."  *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1282 (11th Cir. 1998).  Rather, we ask "whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of [the officer's]

discretionary duties." *Id.* (citation and internal quotation marks omitted).  In other words, we "remove the constitutional taint" from the inquiry.  *Holloman*, 370 F.3d at 1266.

Gilmore argues that the strip search exceeded the scope of Lieutenant Milton and Officer Irizarry's discretionary authority.  In her view, that's so because Lieutenant Milton and Officer Irizarry violated three of their own regulations: (1) they failed to obtain supervisory approval before conducting the strip search; (2) they conducted a manual body-cavity search when only visual inspection was permitted; and (3) they coerced Gilmore to sign the consent form.  But we do not reach those arguments, because Gilmore failed to raise them in the district court.

Although Gilmore had at least three opportunities to challenge the district court's discretionary-authority determination, she did not do so.  First, she did not make any discretionary-authority arguments in her opposition to Defendants' motion for summary judgment.  Second, she did not file a supplemental brief on the discretionary-authority issue, even though the magistrate judge specifically solicited that briefing.  Third, in her objections to the R&R, Gilmore did not challenge the magistrate judge's finding that Defendants acted within their discretionary authority.  So as a general matter, Gilmore cannot make a discretionary-authority argument for the first time on appeal.  *See, e.g.*, *T.R. ex rel. Brock v. Lamar Cnty. Bd. of Educ.*, 25 F.4th 877, 885 (11th Cir. 2022).

That rule, though, is not absolute.  When a plaintiff fails to object to an R&R or to respond to the defendant's arguments in the

district court, "we, at most, review the appeal 'for plain error if necessary in the interests of justice.'" *Dupree v. Owens*, 92 F.4th 999, 1004 (11th Cir. 2024) (quoting 11th Cir. R. 3-1). In such a case, we apply the "heightened civil plain error standard," under which "we will review for plain error only if the issue involves a pure question of law, and if refusal to consider it would result in a miscarriage of justice." *Roy v. Ivy*, 53 F.4th 1338, 1351 (11th Cir. 2022) (citation and internal quotation marks omitted); *see also Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1332 (11th Cir. 2004).

Gilmore's discretionary-authority issue fails at the first step. That is, the discretionary-authority determination is not "a pure question of law." *See id.* Rather, it presents a mixed question of law and fact. True, we must define the bounds of the officers' authority, which requires us to interpret law and regulations. But we must then apply the law to the facts to determine whether the officers' search fell within that authority. *See Mikko*, 857 F.3d at 1144. Because Gilmore's discretionary-authority argument does not present a pure legal question, we do not review it.

Instead, we apply the two-prong qualified-immunity framework.

### B. Defendants' strip search violated Gilmore's Fourth Amendment rights.

Again, the first prong of that framework requires us to ask whether the search violated Gilmore's constitutional rights. *See Alcocer*, 906 F.3d at 951. We conclude that it did.

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. For that reason, the "ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). We apply a twofold inquiry to determine whether a search was reasonable: we ask whether the search was (1) "justified at its inception" and (2) "reasonably related in scope to the circumstances which justified the interference in the first place." *New Jersey v. T.L.O.*, 469 U.S. 325, 341 (1985) (citation and internal quotation marks omitted). Here, neither Defendants' justification for the strip search nor the scope of the manual body-cavity search was reasonable.[3]

### *1. Justification for the Search*

Until now, neither we nor the Supreme Court has explicitly defined the standard for strip searches of a free person visiting a jail or prison. We now hold that correctional officers must have at least reasonable suspicion that a visitor is concealing contraband (e.g., drugs or weapons) before they may strip-search that visitor.

As relevant here, Supreme Court precedent on prison searches accounts for two important considerations. First, the Supreme Court has characterized prison as "a unique place fraught with serious security dangers. Smuggling of money, drugs,

---

[3] We use the term "manual body-cavity search" as well as the umbrella term "strip search." *See Search*, Black's Law Dictionary (11th ed. 2019) (defining "manual body-cavity search" as "[a] strip search in which the police engage in some touching or probing of a person's orifices"); *see also Parkell v. Danberg*, 833 F.3d 313, 327 (3d Cir. 2016).

weapons, and other contraband is all too common an occurrence." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979). But second, prisoners and civilians "stand in wholly different circumstances, separated by the harsh facts of criminal conviction and incarceration." *T.L.O.*, 469 U.S. at 338 (citation and internal quotation marks omitted). To show how we reconcile these considerations, we briefly review three cases involving strip searches of detainees or prisoners, where these considerations played an important role in the analysis: *Bell*, 441 U.S. 520; *Powell v. Barrett*, 541 F.3d 1298 (11th Cir. 2008) (en banc); and *Florence v. Board of Chosen Freeholders of County of Burlington*, 566 U.S. 318 (2012).

First, in *Bell*, the Supreme Court upheld as reasonable under the Fourth Amendment a blanket policy that required prisoners "to expose their body cavities"—including their "vaginal and anal cavities"—"for visual inspection as a part of a strip search conducted after every contact visit a prisoner had with a person from outside the institution." *See* 441 U.S. at 558 & n.39. In support of its conclusion, the Court recognized the prison's "significant and legitimate security interests" in preventing the introduction of contraband. *See id.* at 560. But because strip searches "may invade the [prisoners'] personal privacy," the Court said, officers may not conduct them "in an abusive fashion." *Id.*

Next, in *Powell*, we held that "a policy or practice of strip searching all arrestees as a part of the process of booking them into the general population of a detention facility, even without reasonable suspicion to believe that they may be concealing contraband"

did not violate the Fourth Amendment. *See* 541 F.3d at 1300, 1314. We limited our holding, though, to cases "where the strip search is no more intrusive than the one the Supreme Court upheld in *Bell*" and is "not conducted in an abusive manner." *Id.* Unlike here, the plaintiffs did not challenge the scope of the search. *See id.* at 1301.

Finally, in *Florence*, the Supreme Court upheld a jail's blanket policy of strip-searching detainees before the jail admitted them to general population. *See* 566 U.S. at 324, 339. The Court characterized the detection of contraband as "a most serious responsibility," given its potential to "disrupt the safe operation of a jail" or prison. *Id.* at 332. Given those "legitimate penological interests," the Court reasoned, strip searches (including visual body-cavity searches) did not violate the detainees' Fourth Amendment rights. *Id.* at 326, 339 (citation and internal quotation marks omitted). Notably, the strip searches at issue did "not include any touching of unclothed areas"—and the Court declined to address what it characterized as the "legitimate concerns about the invasiveness" of such searches. *Id.* at 325, 339.

To that end, the Court was careful to limit *Florence* to its context. *See id.* Multiple Justices, writing separately, also emphasized those limitations. For instance, Chief Justice Roberts said that "it is important for me that the Court does not foreclose the possibility of an exception to the rule it announces." *Id.* at 340 (Roberts, C.J., concurring). And Justice Alito cautioned that "[t]he Court does not address whether it is always reasonable, without regard to the offense or the reason for detention, to strip search an arrestee before

the arrestee's detention has been reviewed by a judicial officer." *Id.* at 341 (Alito, J., concurring). For his part, Justice Breyer explained that "[t]he case is limited to strip searches of those arrestees entering a jail's general population." *Id.* at 342 (Breyer, J., dissenting).

In other words, *Florence* does not stand for the proposition that suspicionless strip searches aimed at detecting contraband in a jail or prison are *per se* lawful—even for arrestees, detainees, or prisoners.

Rather, collectively, these opinions tell us that, for security reasons, arrestees, detainees, and prisoners may be searched without suspicion in certain circumstances. But none of these cases involved a free person. And a free person visiting a prison is in a different position for Fourth Amendment purposes than a prisoner or detainee. *See Padgett v. Donald*, 401 F.3d 1273, 1278 (11th Cir. 2005) ("Prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison, but they do not enjoy the same Fourth Amendment rights as free persons." (citations and internal quotation marks omitted)).

Gilmore, of course, was a free person when the events here occurred. She was not an arrestee, a detainee, or a prisoner. And she was not bound for the jail's general population.[4] Nor, accepting

---

[4] Sister circuits have limited *Florence* to authorizing strip searches of detainees joining the general jail population only. *See Fonder v. Sheriff of Kankakee Cnty.*, 823 F.3d 1144, 1146 (7th Cir. 2016); *Hinkle v. Beckham Cnty. Bd. of Cnty. Comm'rs*, 962 F.3d 1204, 1237 (10th Cir. 2020). Another circuit found a blanket policy of

Gilmore's version of the facts, did Defendants have reasonable sus-
picion to believe that she was carrying contraband.  Defendants
also did not strip-search Gilmore under a blanket policy.  So *Bell*,
*Powell*, and *Florence* are not instructive as to whether a suspicionless
strip search of Gilmore was "reasonable" under the Fourth Amend-
ment.

 Since *Bell*, *Powell*, and *Florence* do not resolve this case, we
consider cases from outside the prison context.  Those cases sup-
port a reasonable-suspicion requirement.

 For instance, to strip-search an arrestee, "an officer must
have at least a reasonable suspicion that the strip search is necessary
for evidentiary reasons"—and that standard may be "higher" where
"the search includes touching genitalia and penetrating anuses."
*Evans v. Stephens*, 407 F.3d 1272, 1279–80 (11th Cir. 2005) (en banc);
*see also Cuesta v. Sch. Bd. of Miami-Dade Cnty.*, 285 F.3d 962, 969 (11th
Cir. 2002) ("the Fourth Amendment requires jail officials to have
'reasonable suspicion' that an arrestee is concealing weapons or
contraband before they can perform a strip search"); *United States
v. York*, 578 F.2d 1036, 1041 (5th Cir. 1978);[5] *cf. also Terry v. Ohio*, 392
U.S. 1, 21–22, 27 (1968)  (requiring reasonable suspicion to "stop-
and-frisk" a detainee).  It would make little sense to impose a

_____

routine visual body-cavity searches of *prisoners* who had not recently been in
contact with the outside world to be unreasonable.  *Parkell*, 833 F.3d at 330.

[5] All Fifth Circuit decisions issued by the close of business on September 30,
1981, are binding precedent in this Court.  *Bonner v. City of Prichard*, 661 F.2d
1206, 1207 (11th Cir. 1981) (en banc).

higher standard for strip searches of arrestees, whom officers have probable cause to suspect of criminal wrongdoing, than civilians visiting prisons.

Though of course not precisely on point, precedent from the school context is also instructive. There, we require "reasonable suspicion of danger or of resort to underwear for hiding evidence of wrongdoing" before school officials may strip-search a student. *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 377 (2009); *see also T.R.*, 25 F.4th at 882, 885, 888 (strip searches of student, during which officials asked the student to "lift her breasts" and "bend over," based on a "general possibility" that the student was concealing marijuana, were constitutionally unreasonable).

Similarly, we have required reasonable suspicion "for highly intrusive searches of a person's body such as a strip search or an x-ray examination" at the border. *United States v. Alfaro-Moncada*, 607 F.3d 720, 729 (11th Cir. 2010); *see also Brent v. Ashley*, 247 F.3d 1294, 1302 (11th Cir. 2001) (requiring "particularized and objective evidence that would raise reasonable suspicion" for strip search of border entrant); *United States v. Afanador*, 567 F.2d 1325, 1329 (5th Cir. 1978) (requiring "reasonable suspicion" for strip searches at the border). This line of cases is particularly notable because, in most circumstances, we do not require *any* suspicion for any border searches. *See United States v. Vergara*, 884 F.3d 1309, 1312 (11th Cir. 2018). Rather, given the natural security and sovereignty interests at stake, most border searches "are reasonable simply by virtue of the fact that they occur at the border." *See United States v. Ramsey*,

431 U.S. 606, 616 (1977). Yet our precedent draws the reasonable-suspicion line at "highly intrusive" strip searches. *See Alfaro-Moncada*, 607 F.3d at 729.

So we require reasonable suspicion for strip searches of arrestees, students, and border entrants. We now extend that reasonable-suspicion requirement to searches of prison visitors. In doing so, we join the unanimous consensus reached by nine of our sister circuits. *See Wood v. Clemons*, 89 F.3d 922, 928–29 (1st Cir. 1996); *Varrone v. Bilotti*, 123 F.3d 75, 79 (2d Cir. 1997); *Calloway v. Lokey*, 948 F.3d 194, 202 (4th Cir. 2020); *Thorne v. Jones*, 765 F.2d 1270, 1276 (5th Cir. 1985); *Daugherty v. Campbell*, 935 F.2d 780, 787 (6th Cir. 1991); *Burgess v. Lowery*, 201 F.3d 942, 945 (7th Cir. 2000); *Hunter v. Auger*, 672 F.2d 668, 674 (8th Cir. 1982); *Cates v. Stroud*, 976 F.3d 972, 985 (9th Cir. 2020); *Romo v. Champion*, 46 F.3d 1013, 1020 (10th Cir. 1995). And, we note, two of those decisions postdate *Florence*, undermining any argument that *Florence* precludes a reasonable-suspicion standard for prison visitors. *See Calloway*, 948 F.3d at 202; *Cates*, 976 F.3d at 985.

We now apply this standard to the facts of Gilmore's case. When we take the facts most favorably to Gilmore, Defendants lacked reasonable suspicion for the strip search. Gilmore denies consuming, possessing, or smelling like marijuana at any point before or during her visit. She also denies watching Officer Lupo during her visit. So at most, Gilmore "stared" at Lieutenant Milton for "one to two minutes." That was not enough for Lieutenant Milton to reasonably suspect that Gilmore was concealing or smuggling

contraband and to justify a strip search.[6]  And it certainly did not justify a manual body-cavity search, as we discuss in further detail below.

What's more, the strip search did not reveal any contraband. As we have reasoned, the "lack of revealed evidence" from a strip search "undermines the reasonableness of [the officer's] belief that [the person searched] possessed drugs." *See Evans*, 407 F.3d at 1280. Given these facts, the search was so "devoid of penological merit" that it violated Gilmore's Fourth Amendment rights.  *See Harris v. Ostrout*, 65 F.3d 912, 916 (11th Cir. 1995).

As the Supreme Court has recognized, strip searches are "embarrassing, frightening, and humiliating." *Safford*, 557 U.S. at 374–75; *see also Evans*, 407 F.3d at 1283 (characterizing strip search involving physical contact as "degrading").  This reality does not evaporate at the prison door.  *Cf. Turner v. Safley*, 482 U.S. 78, 84 (1987) ("Prison walls do not form a barrier separating [individuals] from the protections of the Constitution").  To be sure, we afford prison officials "substantial discretion to devise reasonable solutions" to the safety and security concerns presented by outside contraband.  *Florence*, 566 U.S. at 326.  But a suspicionless strip search of a prison visitor is not a "reasonable solution[]."  *See id.*  And we

---

[6] Under Gilmore's version of the facts, Defendants also violated their own policy, which requires reasonable suspicion before a strip search may be conducted.  Still, we do not "conflat[e] a violation of departmental policy with a violation of the Constitution." *See United States v. Brown*, 934 F.3d 1278, 1296 (11th Cir. 2019).

have no trouble concluding that such a search violated Gilmore's Fourth Amendment rights.

## 2. Scope of the Search

Besides that, the search as Gilmore has described it went even further than the blanket searches in *Florence*—it involved touching. And that presents its own "invasiveness" "concerns." *See Florence*, 566 U.S. at 339.

We have already found that Defendants lacked reasonable suspicion that would justify a strip search. But that is only one half of the reasonableness inquiry. *See T.L.O.*, 469 U.S. at 341. We also conclude that Defendants' manual body-cavity search was unreasonable in scope and violated Gilmore's Fourth Amendment rights for that independent reason.

In determining whether the manner of a search is reasonable, we examine "the scope of the particular intrusion, the manner in which it is conducted, . . . and the place in which it is conducted." *Powell*, 541 F.3d at 1305 (quoting *Bell*, 441 U.S. at 559). We also consider the availability of less intrusive alternatives. *See, e.g.*, *D.H. ex rel. Dawson v. Clayton Cnty. Sch. Dist.*, 830 F.3d 1306, 1317–18 (11th Cir. 2016).

"It is axiomatic that a strip search represents a serious intrusion upon personal rights" because it is "demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission." *Justice v. Peachtree City*, 961 F.2d 188, 192 (11th Cir. 1992) (quoting *Mary Beth G.*, 723 F.2d at 1272). And that intrusion is magnified when

"physical contact between the searcher and the person searched" occurs. *United States v. Touset*, 890 F.3d 1227, 1234 (11th Cir. 2018); *cf. also Bond v. United States*, 529 U.S. 334, 337 (2000) ("Physically invasive inspection is simply more intrusive than purely visual inspection."). In other words, when we evaluate the reasonableness of Defendants' strip search of Gilmore, "[i]t matters that a body cavity search was undertaken." *See Evans*, 407 F.3d at 1281.

As we've already explained, Defendants lacked reasonable suspicion to strip-search Gilmore in the first place. So they could not expand the scope of that search by manipulating Gilmore's breasts and touching "in between" Gilmore's buttocks. That only compounded the "degrading" and unreasonable nature of the search. *See Evans*, 407 F.3d at 1283. Indeed, Defendants' own regulations prohibited "[b]ody cavity and invasive searches" even if reasonable suspicion justified a strip search of a visitor. Though Defendants' noncompliance with their regulations is not dispositive of a constitutional violation, it is certainly relevant evidence. *Cf. Hope v. Pelzer*, 536 U.S. 730, 743–45 (2002).

Also relevant is the availability of less restrictive alternatives. *See D.H.*, 830 F.3d at 1317–18. Gilmore had already undergone— and passed—a pat-down search, metal detector wand, and body scan. But even if Defendants continued to suspect that Gilmore possessed contraband, they could have barred her from leaving their sight throughout the remainder of her visit (after all, it's hard to imagine how, undetected, she could have extracted contraband from a body cavity in public). Or they could have ended her visit

or asked if she would rather leave than submit to a strip search. *See Cates*, 976 F.3d at 983; *Burgess*, 201 F.3d at 945.

And even if a strip search had been justified (again, it was not), the officers could have "limited the search to exclude body cavities." *See Justice*, 961 F.2d at 193. At the very least, Lieutenant Milton could have asked Gilmore to lift her own breasts rather than instructing Officer Irizarry to do so.

In sum, Defendants' manual body-cavity search was search was neither "justified at its inception" nor reasonable in scope. *See T.L.O.*, 469 U.S. at 341. So the search violated Gilmore's Fourth Amendment rights.

*C.  The reasonable-suspicion requirement for a strip search of a prison visitor was not clearly established when Defendants strip searched Gilmore.*

But a constitutional violation does not itself defeat qualified immunity. Rather, Gilmore can overcome the defense of qualified immunity only if prison visitors' Fourth Amendment right to be free from strip searches without reasonable suspicion was "clearly established" at the time of the search. *See Alcocer*, 906 F.3d at 951. It was not.

A "right can be clearly established in one of three ways." *Crocker v. Beatty*, 995 F.3d 1232, 1240 (11th Cir. 2021). Gilmore "must point to either (1) 'case law with indistinguishable facts,' (2) 'a broad statement of principle within the Constitution, statute, or case law,' or (3) 'conduct so egregious that a constitutional right

was clearly violated, even in the total absence of case law.'" *Id.*
(quoting *Lewis v. City of West Palm Beach*, 561 F.3d 1288, 1291–92
(11th Cir. 2009)).  And in this Circuit, when we conduct this analy-
sis, "we look to binding decisions of the Supreme Court of the
United States, this Court, and the highest court of the relevant
state"—here, Georgia.  *Glasscox v. City of Argo*, 903 F.3d 1207, 1217
(11th Cir. 2018).[7]  Precedent from other jurisdictions cannot clearly
establish the law in our Circuit.  *See id.*

Gilmore does not point to "case law with indistinguishable
facts."  *See Crocker*, 995 F.3d at 1240 (quoting *Lewis*, 561 F.3d at 1291–
92).  Nor could she.  She must rely, then, on the second or third
alternatives: a "broad statement of principle" or "egregious" con-
duct.  *See id.* (quoting *Lewis*, 561 F.3d at 1292).

We begin with the second.  Under the "broad principle" al-
ternative, "[e]xact factual identity with a previously decided case is
not required, but the unlawfulness of the conduct must be appar-
ent from pre-existing law."  *Coffin v. Brandau*, 642 F.3d 999, 1013
(11th Cir. 2011) (en banc).  And we conduct that inquiry based on
"the specific context of the case," not based on a "broad general
proposition."  *Id.* (citation and internal quotation marks omitted).
To that end, where "case law, in factual terms, has not staked out a
bright line, qualified immunity almost always protects the

---

[7] Gilmore contends that a "robust consensus of . . . persuasive authority" may
also "clearly establish[]" a constitutional right.  *See District of Columbia v. Wesby*,
583 U.S. 48, 63 (2018); *Glasscox*, 903 F.3d at 1217.  But as we discuss, our prec-
edent rejects that path to defeating qualified immunity.

defendant." *Smith v. Mattox*, 127 F.3d 1416, 1419 (11th Cir. 1997) (citation and internal quotation marks omitted).

Here, case law "has not staked out a bright line," *see id.*, with respect to strip searches of prison visitors. As we've mentioned, we have required reasonable suspicion for strip searches of arrestees, *Evans*, 407 F.3d at 1279; students, *Safford*, 557 U.S. at 377; and border entrants, *Alfaro-Moncada*, 607 F.3d at 729. And on the other side of the scale, we and the Supreme Court have upheld suspicionless strip searches of prisoners under blanket policies. *See Bell*, 441 U.S. at 558; *Florence*, 566 U.S. at 324, 339; *Powell*, 541 F.3d at 1300. In Gilmore's view, those cases are enough to clearly establish that reasonable suspicion was required for a strip search of a prison visitor in 2017.

We disagree. As the Supreme Court has emphasized, we evaluate whether a right is clearly established "on the basis of the specific context of the case." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (citation and internal quotation marks omitted). And this requirement applies with even more force in the Fourth Amendment context, where "what is reasonable depends on the context within which a search takes place." *See Maryland v. King*, 569 U.S. 435, 461–62 (2013).

So we return to the closest case on point, *Evans*. There, the defendant police officer arrested the plaintiffs and conducted a strip search in a supply closet. *See* 407 F.3d at 1276. During that search, the officer used a baton to "str[ike]" the plaintiffs' anuses and "lift [their] testicles" and "taunted" the plaintiffs with "racist language."

*Id.* at 1277.  We found that the underlying constitutional right had not been "clearly established" but that "the Fourth Amendment itself provided . . . sufficient notice that the manner of these particular searches was 'unreasonable' in the constitutional sense." *Id.* at 1278.  That was because the officer lacked reasonable suspicion that the plaintiffs had drugs on their person, and the scope of the search was "degrading and forceful." *Id.* at 1280–83.

But, we expressly "stress[ed]," we did not decide whether the reasonable-suspicion "standard applie[d] to strip searches for other purposes, such as, searches conducted by jailers on arrestees bound for a jail's general population as part of a safety or security routine of the jail." *Id.* at 1279 n.8.  Put simply, *Evans* limited itself to its context: investigatory searches of arrestees.  It did not "clearly establish" that strip searches of prison visitors without reasonable suspicion are constitutionally unreasonable.  At most, it suggested as much by analogy, but we do not require officers "to be creative or imaginative in drawing analogies from previously decided cases." *Coffin*, 642 F.3d at 1015 (citation and internal quotation marks omitted).

Nor did the school-search or border-search cases "clearly establish" the applicable law.  Again, cases like *Safford* and *Alfaro-Moncada* support our finding that Defendants' strip search violated Gilmore's constitutional rights.  But they fail to account for the unique safety and security considerations inherent in the prison context.  *See Bell*, 441 U.S. at 558–59; *Florence*, 566 U.S. at 326.  So they did not—and could not—"clearly establish" that a strip search

at a prison required reasonable suspicion. In short, the "broad principle" alternative cannot defeat qualified immunity here.

Nor can the third alternative, which we have referred to as the "obvious clarity" exception. *See, e.g.*, *Coffin*, 642 F.3d at 1015. Cases meeting that exception are "rare in general" and "even more rare" in the "inherently fact-specific" Fourth Amendment context. *Id.* And here, given cases like *Bell* and *Florence*, we cannot say that a constitutional violation would have been "obvious" to any reasonable officer. But qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (citation and internal quotation marks omitted). While we are certainly troubled by the facts of the search as alleged, the prison strip-search cases preclude us from saying Defendants were "plainly incompetent" or "knowingly violate[d] the law." *See id.*

Gilmore advances two additional arguments that the law was "clearly established" in her favor. Neither succeeds.

First, Gilmore argues that the strip search violated Defendants' own regulations, so Defendants were necessarily on notice that they were violating Gilmore's constitutional rights. *See Al-Amin v. Smith*, 511 F.3d 1317, 1336 n.37 (11th Cir. 2008) (regulations can "undermine any claim by defendants that they were unaware of their legal obligations"). But our qualified-immunity analysis does not ask whether a defendant violated "clearly established" regulation; it asks whether a defendant violated "clearly established" law. *See id.* ("regulations . . . do not constitute constitutional law");

*cf. also Davis v. Scherer*, 468 U.S. 183, 194 n.12 (1984) (officials do not "lose their immunity by violating the clear command of a statute or regulation . . . unless that statute or regulation provides the basis for the cause of action sued upon"). So we must reject Gilmore's argument.

Second, Gilmore suggests another path to "clearly established" law: a "robust consensus of . . . persuasive authority." *See Wesby*, 583 U.S. at 63; *Glasscox*, 903 F.3d at 1217. As we've pointed out, by 2017, when the search here occurred, seven circuits had required reasonable suspicion for a strip search of a prison visitor. *See Wood*, 89 F.3d at 928–29; *Varrone*, 123 F.3d at 79; *Thorne*, 765 F.2d at 1276; *Daugherty*, 935 F.2d at 787; *Burgess*, 201 F.3d at 945; *Hunter*, 672 F.2d at 674; *Romo*, 46 F.3d at 1020. That, Gilmore claims, was enough to put Defendants on notice that they were violating her constitutional rights. And "[t]he touchstone of qualified immunity is notice." *Moore v. Pederson*, 806 F.3d 1036, 1046 (11th Cir. 2015).

To be sure, both we and the Supreme Court have suggested that "a robust 'consensus of cases of persuasive authority'" may "place[] the statutory or constitutional question beyond debate." *Carollo v. Boria*, 833 F.3d 1322, 1333 (11th Cir. 2016) (quoting *al-Kidd*, 563 U.S. at 741–42); *see also Wesby*, 583 U.S. at 63; *Glasscox*, 903 F.3d at 1217. But in neither *Carollo* nor *Glasscox* did we actually consult persuasive authority when reaching our holding. *See Carollo*, 833 F.3d at 1334 (relying on Supreme Court cases and a "robust consensus of *our* precedent" (emphasis added)); *Glasscox*, 903 F.3d at 1218 (relying on two Eleventh Circuit cases). At most, then, those

statements are dicta, which do not bind us. *See, e.g.*, *United States v. Gillis*, 938 F.3d 1181, 1198 (11th Cir. 2019).

What's more, we expressly rejected a similar rule over a decade earlier. *See Thomas ex rel. Thomas v. Roberts*, 323 F.3d 950, 955 (11th Cir. 2003). In *Thomas*, the plaintiffs seized on similar language regarding "a consensus of cases of persuasive authority" from *Wilson v. Layne*, 526 U.S. 603, 617 (1999). *See id.* We "reaffirmed" our pre-*Wilson* position because we did not read *"Wilson* to have held that a consensus of cases of persuasive authority would be able to establish law clearly." *Id.* (citing *Marsh v. Butler County*, 268 F.3d 1014, 1032 n.10 (11th Cir. 2001) (en banc)). And we cannot say that *Wesby* "demolish[ed]" or "eviscerate[d]" *Thomas*'s "fundamental props." *See United States v. Dubois*, 94 F.4th 1284, 1293 (11th Cir. 2024) (citation and internal quotation marks omitted). So *Wesby* did not undermine *Thomas* to the point of abrogation. *See id.* And to the extent that *Carollo* and *Glasscox* conflict with *Thomas*, *Thomas* controls. *See id.* at 1301 (applying "earliest case" rule).

So we do not look to persuasive authority—even a "robust consensus" of it—to determine whether the law was "clearly established" in this Circuit. And no precedent from the Supreme Court, our Circuit, or the Georgia Supreme Court "clearly established" that reasonable suspicion was required for a strip search of a prison visitor in 2017. For these reasons, Defendants are entitled to qualified immunity.

## IV.   CONCLUSION

Strip searches are "degrading," *Evans*, 407 F.3d at 1283; "dehumanizing," *Justice*, 961 F.2d at 192; and "humiliating," *Safford*, 557 U.S. at 375.  Correctional officers must have reasonable suspicion that a prison visitor is carrying contraband before they may strip-search that visitor, and a manual body-cavity search is rarely (if ever) justified in such circumstances.  But because the law was not clearly established to that effect in February 2017, Defendants are entitled to qualified immunity.  We therefore affirm the district court's grant of summary judgment to Defendants.

**AFFIRMED.**

Rosenbaum, Circuit Judge, concurring:

"[W]hen a precedent of the Supreme Court has direct application, we must follow it." *United States v. Johnson*, 921 F.3d 991, 1001 (11th Cir. 2019) (en banc) (cleaned up). For more than a quarter of a century, the Supreme Court has repeatedly directed that "a robust 'consensus of cases of persuasive authority'" can "clearly establish" a constitutional violation for qualified-immunity purposes. *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011) (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)); *see also District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018). Yet we have consistently dodged that directive. It's time to bring our precedent into the twenty-first century.

## I.

To recap, qualified immunity shields officers from civil liability so long "as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Carruth v. Bentley*, 942 F.3d 1047, 1053 (11th Cir. 2019) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). The Supreme Court has identified two sources of law that may clearly establish a right: "controlling authority" or "a robust consensus of cases of persuasive authority." *Wesby*, 583 U.S. at 63 (citation and internal quotation marks omitted); *see also al-Kidd*, 563 U.S. at 742 ("absent controlling authority," only a "robust 'consensus of persuasive authority'" can clearly establish a constitutional right (quoting *Wilson*, 526 U.S. at 617)); *Elder v. Holloway*, 510 U.S. 510, 516 (1994) ("A court engaging in review of a qualified immunity judgment should therefore use its full knowledge of its own

[and other relevant] precedents." (alterations in original) (citation and internal quotation marks omitted)).

"[C]ontrolling authority" is easy enough. We have long recognized that includes "binding decisions of the Supreme Court of the United States, this Court, and the highest court of the relevant state"—here, Georgia. *Glasscox v. City of Argo*, 903 F.3d 1207, 1217 (11th Cir. 2018).

But when the Supreme Court explained in 1999 that "a consensus of cases of persuasive authority" can "clearly establish" a constitutional violation for qualified-immunity purposes, *see Wilson*, 526 U.S. at 617, we declined to recognize it. At the turn of this century, seizing on *Wilson*'s plain language, a plaintiff argued that a "consensus of cases of persuasive of authority" "clearly established" a constitutional violation. *See Marsh v. Butler County*, 268 F.3d 1014, 1032 n.10 (11th Cir. 2001) (en banc), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 561–63 (2007). We summarily rejected that argument, saying only that we did "not understand *Wilson* . . . to have held that a 'consensus of cases of persuasive authority' from other courts would be able to establish the law clearly." *Id.* (quoting *Wilson*, 526 U.S. at 617).

Then in *Thomas ex rel. Thomas v. Roberts*, 323 F.3d 950, 955 (11th Cir. 2003), we doubled down on our failure to follow *Wilson*. We said that *Marsh* "implicitly reaffirmed" our pre-*Wilson* position. *Id.* (citing *Marsh*, 268 F.3d at 1032 n.10). So, we reasoned, any "argument based upon decisions in other circuits [was] foreclosed by our precedent." *Id.*

From its inception, *Thomas* rested on a faulty premise. There is no way to reasonably read *Wilson* as not acknowledging that "a consensus of cases of persuasive authority" can "clearly establish" the law for qualified-immunity purposes. *See id.* Yet we insist on such a reading.

Later Supreme Court case law renders our decision to ignore *Wilson's* plain language all the more problematic. In *Wesby*, for instance, the Supreme Court explained that, "[t]o be clearly established, a legal principle must . . . [be] dictated by 'controlling authority' or 'a robust "consensus of cases of persuasive authority."'" 583 U.S. at 63 (quoting *al-Kidd*, 563 U.S. at 741–42). Then the Supreme Court applied the "robust consensus" rule it articulated. *See id.* at 65. It found that qualified immunity was proper because the parties had not "identified a single precedent—much less a controlling case *or robust consensus of cases*—finding a Fourth Amendment violation under similar circumstances." *Id.* at 65 (emphasis added) (citation and internal quotation marks omitted). The Court's reference to a "robust consensus of cases," *id.*, would make little sense if such a consensus could not "clearly establish" relevant law. And that is especially so, given that *Wesby* relied on *al-Kidd*, and *al-Kidd* explained that a "robust consensus . . . is necessary absent controlling authority." *See* 563 U.S. at 742 (citation and internal quotation marks omitted).

It is clear, then, that the Supreme Court contemplates a role for "a robust consensus of persuasive authority" in the "clearly established law" inquiry. *See Grayden v. Rhodes*, 345 F.3d 1225, 1251

4                    Rosenbaum, J., Concurring                    23-10343

n.4 (11th Cir. 2003) (Birch, J., concurring).  Yet our precedent does not.

Exacerbating this conflict, our case law on this issue is inconsistent.  Our later case law has suggested (in dicta) that "a robust consensus of . . . persuasive authority" can "place[] the statutory or constitutional question beyond debate."  *Carollo v. Boria*, 833 F.3d 1322, 1333 (11th Cir. 2016) (citation and internal quotation marks omitted); *see also Glasscox*, 903 F.3d at 1217 (11th Cir. 2018) (similar). But of course, as the majority opinion notes, our "earliest-case" rule requires us to follow *Thomas* rather than *Carollo* or *Glasscox*. Maj Op. at 30.  This conflict provides all the more reason to revisit and clarify our case law.

Not only that, but our confusion on this point has caused us to say things that are just downright wrong.  For instance, we have transposed the "robust consensus" language onto the "controlling authority" category.  *See Washington v. Howard*, 25 F.4th 891, 903 (11th Cir. 2022). In *Washington*, we said that the plaintiff could not "identify a controlling case or robust consensus of cases . . . from the Supreme Court, this Circuit, or the Georgia Supreme Court." *Id.* (cleaned up).  But the Supreme Court has never required a "robust consensus of cases . . . from the Supreme Court, this Circuit, or the [relevant state] [s]upreme [c]ourt," *id.*  One case can "clearly establish" law if it is directly on point or applies the relevant broad principle.

Yet despite "defect[s] in the prior panel[s'] reasoning or analysis" on the issue of how the law can be clearly established, we are

bound by our prior panel precedent. *See Smith v. GTE Corp.*, 236 F.3d 1292, 1303 (11th Cir. 2001). That said, those defects are glaring. We cannot opt out of Supreme Court precedent.

I concur in the majority opinion in full because the prior-precedent rule requires me to do so. But we should rehear the "clearly established law" issue en banc to clarify the role of persuasive authority in that analysis. In doing so, I would conform our precedent to the Supreme Court's.

Newsom, Circuit Judge, concurring:

Many have complained that modern qualified-immunity jurisprudence is fundamentally broken for one reason or another. Some say, for instance, that it's textually and historically unjustifiable, at least in its current form. *See, e.g.*, William Baude, *Is Qualified Immunity Unlawful?*, 106 Cal. L. Rev. 45 (2018). Others contend that it bears no connection to the realities of modern policing. *See, e.g.*, Joanna C. Schwartz, *Qualified Immunity's Boldest Lie*, 88 U. Chi. L. Rev. 605 (2021). I'll leave those major-league debates for another day. For now, I'd simply like to highlight a couple of minor-league oddities generated by existing qualified-immunity doctrine.

## I

The first results from the fact that the Supreme Court has bounced around about the order in which reviewing courts should decide qualified-immunity's merits and "clearly established" prongs. Initially, of course, in *Saucier v. Katz*, the Supreme Court held that a reviewing court should always resolve the merits of a plaintiff's constitutional claim first, before determining whether the law underlying that claim was sufficiently clearly established to defeat qualified immunity. *See* 533 U.S. 194, 201 (2001). Less than a decade later, though, in *Pearson v. Callahan*, the Court reversed itself and held that the *Saucier* sequence "should no longer be regarded as mandatory" and that reviewing courts may consider the merits and clearly-established issues in whatever order they wish. *See* 555 U.S. 223, 236 (2009). Both options entail perversities of a sort. On the one hand, if courts routinely bypass the merits in favor

of resolving the qualified-immunity issue on the clearly-established prong, they forgo valuable opportunities to establish law for future cases. *See, e.g.*, Aaron L. Nielson & Christopher J. Walker, *The New Qualified Immunity*, 89 S. Cal. L. Rev. 1 (2015). On the other hand, if a court concludes that a defendant's conduct violated the Constitution, but then goes on to hold that the law wasn't clearly established at the time he acted and that he is therefore entitled to qualified immunity, its merits holding is effectively dictum. *See id.* at 13; Pierre N. Leval, *Judging Under the Constitution: Dicta About Dicta,* 81 N.Y.U. L. Rev. 1249, 1275–76 (2006).

Today's decision takes the latter path, tackling the merits before proceeding to the clearly-established inquiry. And given the circumstances, I think that's the right call: The Fourth Amendment questions that this case presents are important both to prison officials and to would-be prison visitors, and they are likely to recur; accordingly, it makes sense to go ahead and decide them. Even so, I must admit that it feels strange—even a little jarring—to resolve weighty constitutional questions of first impression in what all must agree is (or in ordinary circumstances would be) dictum. The majority opinion—which, to be clear, I join in full, so I'm not throwing shade—announces its resolution of the principal Fourth Amendment issue in the case as follows:

> Until now, neither we nor the Supreme Court ha[ve] explicitly defined the standard for strip searches of a free person visiting a jail or prison. We now hold that correctional officers must have at least reasonable suspicion that a visitor is concealing contraband (e.g.,

drugs or weapons) before they may strip-search that visitor.

Maj. Op. at 14.  It then proceeds to explain at length and in detail the basis for its decision in that respect—and as my joinder reflects, I think that it does so correctly and persuasively.  *See id.* at 14–22. But, and herein lies the rub, the majority opinion goes on (again, I think correctly) to hold—to *hold*—that because no binding authority had "'clearly established' that reasonable suspicion was required for a strip search of a prison visitor" at the time of the events in question here, the prison-official defendants "are entitled to qualified immunity," and thus, importantly, to judgment in their favor. *Id*. at 30–31.

So, if we're being honest, our (important) determination that "correctional officers must have at least reasonable suspicion that a [prison] visitor is concealing contraband . . . before they may strip-search that visitor," *id*. at 14, is definitionally, quintessentially dictum—or at least it would be in *any* other context.  It is, quite literally, "[a] judicial comment made while delivering a judicial opinion, but one that is unnecessary to the decision in the case." *Obiter Dictum*, Black's Law Dictionary (12th ed. 2024).  That's not to say, of course, that the statement is in any way improper—to the contrary, in answering the Fourth Amendment question on the merits, we've done exactly what the Supreme Court has authorized us to do.  It's just *weird* that the qualified-immunity two-step permits—and in some way even encourages—courts to do the very thing that we would otherwise condemn.

## II

    The second oddity relates to the question whether a reviewing court can consider non-binding authority in determining whether the law at issue was "clearly established" for qualified-immunity purposes.  Today's majority opinion correctly recognizes that existing Eleventh Circuit precedent prevents us from looking beyond this Court's jurisdictional boundaries in search of clearly established law.  *See* Maj. Op. at 30–31; *accord, e.g.*, *Bradley v. Benton*, 10 F.4th 1232, 1242–43 (11th Cir. 2021) (same).  In her separate concurring opinion, Judge Rosenbaum makes the case that our rule contravenes the Supreme Court's own precedent, which, she says, has long recognized that not only "controlling authority" but also "a robust consensus of cases of persuasive authority" can clearly establish the law.  *See* Rosenbaum Conc. Op. *passim* (citing, e.g., *Wilson v. Layne*, 526 U.S. 603, 617 (1999), *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011), and *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)).

    I share Judge Rosenbaum's concern that we may well be out of step with the Supreme Court's view about the role of non-binding authority in the qualified-immunity calculus.  But I'll confess that I'm not at all sure how a "robust consensus" rule would (or should) operate in the real world.  For better or worse, modern qualified-immunity doctrine bottoms on notions of "fair notice" to government officials.  *See Hope v. Pelzer*, 536 U.S. 730, 739 (2002); *Wesby*, 583 U.S. at 63.  Accordingly, in determining whether a "robust consensus of persuasive authority" can clearly establish the law for qualified-immunity purposes, we should presumably ask

whether that sort (and exactly *what* sort) of consensus gives offi-cials the requisite notice.[1]  And at the risk of getting all meta, the answer to *that* question, in turn, may well turn on one's views on the nature of law itself—evocative, in a way, of the well-worn de-bates surrounding *Swift* and *Erie*.

Here's what I mean:  Is "the law"—of the sort that either is or isn't clearly established—necessarily the product of some sover-eign law*giver*?  Or can it exist of its own force, without the need for a formal, authoritative, binding decree?  If it's the former, then there's presumably no basis for looking beyond our jurisdictional boundaries in assessing whether "the law" was clearly established.  On that view, government officials working within the confines of the Eleventh Circuit are entitled to limit their search for and knowledge of "the law" to this court's binding decisions—other courts' decisions may be interesting, they may be informative, but they can't clearly establish "the law."  But if it's the latter—if "the law" can exist independently of a binding decree—then the rule that only in-circuit decisions can clearly establish that law for qual-ified-immunity purposes makes a lot less sense.

Inasmuch as real-world "fair notice" is qualified-immunity's lodestar, I think I lean toward the latter view.  Especially in a case like this, in which (1) our own analogous-but-not-binding decisions

---

[1] It's worth noting that the answer to this question may be influenced by the answer to what kinds of precedents qualify as "controlling" authority for qual-ified-immunity purposes—a question the Supreme Court seems to have re-served.  *See Wesby*, 583 at 66 n.8.

involving arrestees, students, and border entrants have required
that strip searches be supported by reasonable suspicion, *see* Maj.
Op. at 19–20, and (2) all nine of our sister circuits that have consid-
ered the issue have held that the Fourth Amendment requires rea-
sonable suspicion for strip searches of prison visitors, *see* Maj. Op.
at 20, it seems eminently reasonable to conclude that "the law"
gave the prison officials at Smith State Prison "fair notice" that their
suspicionless strip search of Clarissa Gilmore was unconstitu-
tional.[2]  To be candid, though, that's little more than my own
"sense"—a vibe.  If we changed any (or several) of the inputs, I
might well have a *different* sense.  What if, for instance, this Court
hadn't required reasonable suspicion in the arrestee, student, and
border-entrant contexts, and we were thus left with only the nine-
circuit consensus regarding strip searches of prison visitors?  Would
I have the same sense about the fairness of imputing notice to the
Smith officials?  Probably, but I can't be sure.  What if the other cir-
cuits weren't unanimous—say, that seven had required reasonable
suspicion but two hadn't?  Six and three?  Or what if our sister cir-
cuits were unanimous, but only four had decided the issue, rather
than nine?  Who knows.

      You can probably see where this is going:  It all feels, well,
kind of made up.  And as I've said before, "if there is any fixed star

---

[2] So reasonable, in fact, that both in their pleadings below and at oral argument
before us, the Smith officials *agreed* that "reasonable suspicion" is "the correct
standard"—what the Fourth Amendment requires to initiate a strip-search of
a prison visitor.  *See* Or. Arg. at 14:00–30; Doc. 50-1 at 12; Doc. 55 at 14.

in my own constitutional constellation, it's that unelected, unaccountable federal judges shouldn't make stuff up." *Club Madonna Inc. v. City of Miami Beach*, 42 F.4th 1231, 1261 (11th Cir. 2022) (Newsom, J., concurring in part and dissenting in part) (citation omitted).

\*   \*   \*

I realize, of course, that I'm just identifying problems, not offering solutions—which, I know, can be annoying. By and large, though, we "inferior court[]" judges, *see* U.S. Const. art. III, § 1, have to play the hand the Supreme Court deals us. It may be that the problems I've highlighted—minor-league as they are—indicate that the time is coming (has come?) for that Court to consider a major-league reassessment of its qualified-immunity jurisprudence.